# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Jane Doe

_____

_____
Write the full name of each plaintiff.

\_\_\_\_\_CV_____
(Include case number if one has been assigned)

-against-

University of Chicago, University of Chicago Medical Center, Saul Levmore, Thomas Miles, Michele Richardson, Michael Schill, Abbie Willard, and David Zarfes

_____

_____
Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

## COMPLAINT

Do you want a jury trial?
☑ Yes    ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☑   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
Racketeer Influenced and Corrupt Organizations Act
_____

_____

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , Jane Doe
_____, is a citizen of the State of
(Plaintiff's name)

Hawaii (unemployed, looking for work here, NY, and NJ)
_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____Saul Levmore_____, is a citizen of the State of
(Defendant's name)

____Illinois_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____University of Chicago_____, is incorporated under the laws of

the State of _____Illinois_____

and has its principal place of business in the State of _____Illinois_____

or is incorporated under the laws of (foreign state) _____Illinois_____

and has its principal place of business in _____Illinois_____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

## A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

Jane                                              Doe
_____
First Name                   Middle Initial       Last Name
78-7006 Walua Rd
_____
Street Address
Kailua Kona                           HI                    96740
_____
County, City                          State                Zip Code
646.416.1853
_____
Telephone Number                      Email Address (if available)

## B.   Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| Saul | Levmore | |
|---|---|---|
| First Name | Last Name | |

Professor, University of Chicago Law School

Current Job Title (or other identifying information)

1111 E 60th St

Current Work Address (or other address where defendant may be served)

| Chicago | IL | 60637 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

| Thomas | Miles | |
|---|---|---|
| First Name | Last Name | |

Dean, University of Chicago Law School

Current Job Title (or other identifying information)

1111 E 60th St

Current Work Address (or other address where defendant may be served)

| Chicago | IL | 60637 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| David | Zarfes | |
|---|---|---|
| First Name | Last Name | |

Professor, University of Chicago Law School

Current Job Title (or other identifying information)

1111 E 60th St

Current Work Address (or other address where defendant may be served)

| Chicago | IL | 60637 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 4:

Michael Schill

First Name                              Last Name
President, University of Oregon

Current Job Title (or other identifying information)
1226 University of Oregon

Current Work Address (or other address where defendant may be served)
Eugene, OR 97403-1226

County, City                              State                    Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:       Please see attached

Date(s) of occurrence:        Please see attached

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

Please see attached

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Please see attached

_____

_____

_____

_____

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

Please see attached

_____

_____

_____

_____

_____

**B. Defendant Information continued**

1. University of Chicago, Office of Legal Counsel, 5801 South Ellis Avenue Suite 619, Chicago, IL 60637

2. University of Chicago Medical Center, Legal Affairs, 5841 South Maryland Avenue MC 1132, Chicago, IL 60637

3. Michele Richardson, Board Chair Elect, Advocate Aurora Health, 3075 Highland Pkwy Ste 600, Downers Grove, IL 60515

4. Abbie Willard, 6278 N Calle Del Halcon, Tucson, AZ 85718-3345

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| December 8, 2021 | s/Jane Doe |
|---|---|
| Dated | Plaintiff's Signature |
| Jane | Doe |
| First Name          Middle Initial | Last Name |
| 78-7006 Walua Rd | |
| Street Address | |
| Kailua Kona          HI | 96740 |
| County, City          State | Zip Code |
| 646.416.1853 | |
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Plaintiff alleges as follows:

## I. THE PARTIES

1. I, Plaintiff Jane Doe, am an individual domiciled and residing in Hawaii.

2. Defendant University of Chicago ("University") is incorporated under the laws of Illinois and has its principal place of business in Illinois.

3. Defendant University of Chicago Medical Center ("Hospital") is incorporated under the laws of Illinois and has its principal place of business in Illinois.

4. Defendant Saul Levmore ("Levmore") is, upon information and belief, an employee of the University domiciled and residing in Illinois.

5. Defendant Thomas Miles ("Miles") is, upon information and belief, an employee of the University domiciled and residing in Illinois.

6. Defendant Michele Richardson ("Richardson") is, upon information and belief, a former employee of the University domiciled and residing in Illinois.

7. Defendant Michael Schill ("Schill") is, upon information and belief, a former employee of the University domiciled and residing in Oregon.

8. Defendant Abbie Willard ("Willard") is, upon information and belief, a former employee of the University domiciled and residing in Arizona.

9. Defendant David Zarfes ("Zarfes") is, upon information and belief, an employee of the University domiciled and residing in Illinois.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). This Court has jurisdiction over Plaintiffs' related state and common-law claims under 28 U.S.C. § 1367.

11. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because this action is one in which: (a) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and (b) complete diversity exists between Plaintiffs and Defendants, who are residents of different states.

12. This Court has personal jurisdiction over Defendants because they reside in, conduct significant business with, or have minimum contacts with New York and took actions in the state which form the basis of Plaintiffs' claims.

13. Venue is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

14. Jurisdiction and venue are therefore proper in the United States District Court for the Southern District of New York.

### III. BACKGROUND FACTS COMMON TO ALL COUNTS

15. Following the failure of the University of Chicago Medical Center to diagnose a catastrophic tumor that affected my brain and while my parents were absent due to bankruptcy, the University of Chicago, a multi-billion-dollar charity where I was a student receiving financial aid, made me its captive; deprived me of medical care; effectively neutered me; drugged and gaslighted me; made me suicidal and psychotic; limited my ability to see my white relatives; prohibited me from seeing my non-white relatives or visiting the country where they lived; forced me work against my will and my doctor's orders; falsified my academic records, including issuing grades, credits, transcripts, and a law degree in violation of its own academic policies; defrauded me of medical malpractice damages and tuition and fees it would have forgone had I been free or had it terminated my enrollment as required by law; and left me destitute and homeless.

16. For Thomas Miles, the current dean of the University of Chicago Law School, my experiences were "not entirely happy" "memories."

17. For me, as a survivor of childhood sexual assault, attending the University of Chicago Law School was worse than being raped repeatedly as a seven-year-old.

### A.  Dates

18. The University and Hospital fiscal year begins July 1 and ends June 30.

19. The University academic year begins in or around September and ends in or around June.

20. In this document, "Year 1" refers to the 2006 – 2007 fiscal and academic years, "Year 2" the 2007 – 2008 fiscal and academic years, "Year 3" the 2008 – 2009 fiscal and academic years, and "Year 4" the 2009 – 2010 fiscal and academic years. Years 1, 2, 3, and 4 are collectively referred to as "All Years."

21. A fiscal year may also be referred to by "FY" and the year it ends. For example, the 2006 – 2007 fiscal year may be referred to as Year 1 or FY2007.

### B.  University of Chicago

22. In 1890, the University, a highly ranked institution of higher learning, was incorporated under the laws of Illinois.

23. According to the University Articles of Incorporation ("Articles"), the Law School was part of the University.

24. The Articles listed Beth Harris as the University contact. Harris was the University general counsel and headed the office of legal counsel ("OLC"), the University's legal office. Previously, she was a lawyer with the Hospital's legal office. OLC and the Hospital's legal office worked together.

25. The University held itself out as caring for and acting to benefit its students. For example, the University Faculty Handbook stated, "We are all part of the broad network of support for our students."

26. The University operated a mental health clinic for students through the University Student Counseling and Resource Service ("University SCRS"). University SCRS was staffed by licensed doctors, psychologists, or other mental healthcare professionals.

### C.  University of Chicago Law School

27. In 1902, the Law School, a highly ranked professional program that is part of the University, was founded. The Law School was known for producing successful judges, lawyers, and other professionals. Graduates included David Rubenstein, a billionaire and philanthropist. According to Forbes, the financial publication, as of October 2021, Mr. Rubenstein's net worth was approximately $4.3 billion.

28. The Law School also held itself out as caring for and acting to benefit students. The Law School was bound by the Faculty Handbook. In addition, the Law School YouTube channel had a video called "Students are First Priority at UChicago Law."

### D.  American Bar Association Standards

29. Since 1923, the first year the American Bar Association ("ABA") began accrediting law schools, the Law School has been accredited by the ABA. As an accredited law school, the Law School was required to follow the American Bar Association Standards for Approval of Law Schools ("ABA Standards" or "Standards"), federal statutory law enacted under the auspices of the Department of Education ("ED"). **(Exhibit 1)**

30. In All Years, the purpose of the Standards was to ensure a minimum level of competence for people eligible to take the bar and practice law. Because law schools were "gateway[s]"

4

for the legal profession, the Standards set "minimum requirements" that law schools were required to follow to protect the interests of the public, law students, and the profession."

**(Exhibit 2)**

31. These requirements included ABA Standard 303, which stated,

> Standard 303. ACADEMIC STANDARDS AND ACHIEVEMENTS
>
> (a) A law school shall have and adhere to sound academic standards, including clearly defined standards for good standing and graduation.
>
> (b) A law school shall monitor students' academic progress and achievements from the beginning of and periodically throughout their studies.
>
> (c) A law school shall not continue the enrollment of a student whose inability to do satisfactory work is sufficiently manifest so that the student's continuation in school would inculcate false hopes, constitute economic exploitation, or detrimentally affect the education of other students.
>
> **(Exhibit 3)**

32. Standard 303(a) required that law schools establish and adhere to academic standards for good standing (continued enrollment) and graduation.

33. Standard 303(b) required that law schools monitor a student's progress, including being aware if she were not in good standing.

34. Standard 303(c) required that law schools terminate the enrollment of a student where her inability to do satisfactory work was so clear that continuing her education would create false hopes, be financially exploitive, or harm the education of other students. This duty to terminate her enrollment was not contingent on her good standing or lack thereof.

### E.  University of Chicago Law School Academic Policies

35. Consistent with ABA Standards, the Law School published academic policies.

36. This complaint relies on the following documents:

1. The Law School Announcements ("Announcements") published during All Years, which are available online, and

2. The University grading key ("Grading Key"), which was included with my academic transcript issued in March 2020.

37. The Announcements referred to contemporaneous Law School Student Handbooks and websites (such as http://www.law.uchicago.edu/courses/index.html and http://www.law.uchicago.edu/courses/). These materials are not publicly available online and may contain additional relevant academic policies.

38. The Announcements and Grading Key discussed many things, including

1. employee titles,

2. if employees were faculty or non-faculty,

3. independent research requirements,

4. graduation requirements,

5. grading, and

6. good standing. **(Exhibit 4, organized by academic year)**

39. In All Years, Zarfes was a lecturer in law.

40. The Law School classified instructors as faculty or non-faculty. Instructors with the title of lecturer in law were not faculty.

41. Independent research was worth three academic credits and could only be overseen by faculty. In addition, to apply for independent research, a student needed to submit a project proposal to a faculty member.

42. To graduate, students needed 105 academic credits and two substantial writing credits, referred to as writing credits in the rest of this document. In Years 1, 2, and 3, writing credits could be given for, among other things, a paper or series of papers for course or seminar. In Year 4, writing credits came to be defined as substantial research papers ("SRPs") and non-substantial research papers ("non-SRPs"). Beginning in Year 4, students needed at least one SRP to graduate.

43. A lecturer in law could not oversee an SRP. A lecturer in law could oversee a non-SRP where his "expertise and guidance inform[ed] the writing process."

44. Where a student failed to complete a class without withdrawing within its first three weeks, the class appeared on her transcript with an "W" or "F" next to it. "W" meant withdrawal and "F" failing. In either case, a student received zero academic credits for the course.

45. Where a student failed two courses in one academic year or failed three courses during her enrollment, she was not in good standing and was ineligible to graduate.

46. In addition, this Complaint assumes that paper extensions were capped at time lost due to illness, one year, or other standard that I failed to meet, which is discussed in greater detail later in this document.

**F.  Underline University of Chicago Law School Transcript**

47. The Law School created at least two versions of my transcript. **(Exhibit 5)** One was the 2020 transcript referred to previously. Another was dated June 2010 and was sent by wire

communications across state lines to the New York Board of Law Examiners ("NBYOLE"), a division within the New York State court system that administers the bar exam.

48. The 2010 and 2020 transcripts were similar, listing the same courses, teachers, and grades. However, only the 2010 transcript showed which courses writing credits were attributed to, which was indicated with an asterisk next to the course name.

49. This document focuses on the following four courses on my transcript:

1.  LAWS 79302 "Art Law" ("Class A") with a professor I refer to as Professor A;

2.  LAWS 49501 "Food and Drug Law" ("Class B") with a professor I refer to as Professor B;

3.  LAWS 43522 "Employer and Labor Law" ("Class C") with two professors, including one I refer to as Professor C; and

4.  LAWS 49901 "Independent Research" ("Class D") with Zarfes.

50. In Year 2, I took Classes A and B. They were worth three academic credits each with their final papers ("Paper A" and "Paper B," respectively) being worth all these credits. In Year 4, I submitted Papers A and B and received six academic credits. However, because there was a paper extension cap that I failed to meet and because I never withdrew from these classes, at the end of Year 3, I should have received Fs for both courses. **If I received Fs for Classes A and B in Year 3, which was my third academic year, then (1) I was not in good standing and was ineligible to graduate, and (2) the six academic credits attributed to Classes A and B were invalid.**

51. In Year 4, I took Class C, which was worth three academic credits, including two academic credits for class participation and one academic credit for the final paper ("Paper C"), which was supposed to fulfil my second writing credit. However, the Law School falsified

this on my transcript, claiming Class C was worth two academic credits. The Law School did this when Professor C refused to accept Paper C, which I submitted late. Instead, she gave me a grade worth two credits for class attendance and participation. Because I failed to complete the course but did not withdraw from it, I should have received an F. **If I received Fs in Classes A, B, and C in Years 3 and 4, which was my third academic year, (1) then I was not in good standing and was ineligible to graduate, and (2) the two academic credits attributed to Class C were fraudulent**.

52. **Class D was a fictive IR course with Zarfes that I never took, that he couldn't oversee because he wasn't faculty, and to which the University attributed one academic credit and one writing credit**. When my professor refused to accept or grade Paper C, Zarfes, with the approval or knowledge of Schill, Richardson, and Willard, accepted and graded Paper C, a paper written for a class he did not teach. Paper C was then attributed to Class D. While independent research was supposed to be worth three academic credits, Class D was listed as being worth one. I received one academic credit and one writing credit for this class. However, I never took independent research or fulfilled the requirements for doing so, such as submitting a project proposal to a faculty member. Further, because Zarfes wasn't faculty, he couldn't oversee independent research. In addition, Zarfes couldn't confer a writing credit for Paper C. Again, he couldn't confer an SRP because he wasn't faculty. While he could confer a non-SRP, he could only do so where his "expertise and guidance inform[ed] the writing process." Since I wrote and submitted Paper C for Class C without Zarfes's input whatsoever, he could not confer a non-SRP. **The credits for Class D – one academic credit and one writing credit – were also invalid.**

53. Again, **I needed two writing credits and 105 academic credits to graduate.**

54. **Without the credits invalidly attributed to Classes A, B, C, and D, I only had one writing credit and 96 academic credits.**

55. Beside the nine academic credits attributed Classes A, B, C, and D, there were another 30 academic credits attributed to ten other classes I took in Years 3 and 4. Since I was should not have been enrolled due to lack of good standing or the ability to do satisfactory work, those 30 academic credits were also fraudulent. **Without those credits, I only had one writing credit and 66 academic credits.**

56. As a result, I did not meet minimum credit requirements necessary to graduate.

57. Further, if I was not in good standing in Years 3 and 4, then I was ineligible to graduate.

58. My transcripts and law degree are therefore invalid.

G. **University of Chicago Medical Center**

59. The Hospital was originally part of the University, but in 1986, it was incorporated under the laws of Illinois.

60. According to its Form 990, a federal tax form, the Hospital was a subsidiary of the University. In its Year 4 Form 990, the Hospital disclosed,

> The sole member of UCMC is the University of Chicago, a not-for-profit entity[.] UCMC provides healthcare, research, and education primarily on the University campus, and its medical staff members are University of Chicago faculty[.] Pursuant to UCMC bylaws, ex-officio members of the UCMC board of trustees are the president of the University, the chair of the University's board, the provost of the University, the CEO of UCMC, and the president of the UCMC medical staff[.] In addition, the University board elects the UCMC trustees, based upon recommendations of the trustee

committee, appoints trustees to fill vacancies, and appoints some members

of certain committees, including the executive committee[.] The president of

the University appoints the CEO of UCMC, and the president of UCMC is

approved by the University's board[.] The University has the power to

amend the bylaws[.] No other third party has authority over UCMC.

61. The Hospital operated a medical clinic for University students called the Student Care Center ("Hospital SCC").

62. To the best of my knowledge, the Hospital did not independently employ its own doctors but paid the University a physicians services fee to use doctors employed by the University.

**H.  University of Chicago Medicine**

63. The University of Chicago Medicine ("UChicago Medicine") was a brand. It included two University schools (the Pritzker School of Medicine and the Biological Sciences Division) and the entire Hospital.

64. UChicago Medicine was not incorporated separately from the University or Hospital. It had the same address as the Hospital.

65. It had a conflicts of interest policy, reproduced in part below,

UChicago Medicine strives to avoid actual or perceived conflicts of interest

that may compromise our ability to provide patient care, transact business,

or make purchasing decisions, or that pose a risk to the operations and

reputation of the hospital. UChicago Medicine personnel and medical staff

members must exercise care in all relationships with vendors or potential

vendors of UChicago Medicine and must refrain from actions that may harm

UChicago Medicine. Examples of these kinds of activities include:

- **Using funds, property, or resources of UChicago Medicine for a non-UChicago Medicine purpose;**

- Using work time compensated by UChicago Medicine for personal benefit;

- Transacting UChicago Medicine business on terms that are less advantageous than those competitively available, or those available through arms-length dealing; and

- Accepting or solicitng [sic] anything of value, either in the form of a gift, contributions, or other items of value from vendors or potential vendors that is not specifically permitted by UChicago Medicine policy. (emphasis added)

66. Under this policy, it appeared the University and Hospital comingled funds and that UChicago Medicine was permitted to use University resources for the Hospital and Hospital resources for the University.

**I.   Money**

My finances

67. In April 2008, which was in Year 2, my parents declared the first of two bankruptcies. They would eventually lose their farm. **(Exhibit 6)**

68. In All Years, to attend the Law School, I borrowed $199,499, including federal student loans totaling $177,627 and a private loan of $21,872. In addition, during my enrollment, I accrued at least $12,961 in interest on these loans. In total, I accrued at least $212,460 in debt while in Law School. **(Exhibit 7)**

69. My loans now total $344,018, and I am in default. **(Exhibit 8)**

70. After accuring this debt, as a condition of graduation, the University prepared and made me sign a document entitled "The Statement of Rights and Obligations." It stated in part,

> I understand that I am obligated to repay the full amount of this loan even if I do not complete my program of study, am unable to obtain employment upon completion, or am otherwise dissatisfied with or do not receive the educational or other services that I have purchased from the University of Chicago. **(Exhibit 9)**

71. Federal student loans are not dischargeable in bankruptcy. In fact, my parents still have student loan debt for my college education.

72. I have repeatedly contacted ED seeking loan forgiveness based on fraud but have been ignored. As a result, I have no hope of repaying the federal government without judicial intervention.

73. Law School tuition was $37,334 in Year 1; $39,198 in Year 2; $41,157 in Year 3; and $43,998 in Year 4.

74. The University was on the quarter system with each academic year consisting of Fall, Winter, and Spring quarters. In Years 1 and 2, I was enrolled in all three quarters. In Year 3, I was enrolled in two quarters. In Year 4, I was enrolled in one quarter. Based on this, I paid the University $118,636 or nearly $120,000 in tuition.

75. The University allotted Law School students living expenses of $19,000 in Years 1 and 2, $19,500 in Year 3, and $19,560 in Year 4. This was less than twice the poverty line.

76. In addition to tuition and living expenses, the University assessed various fees on students, such those for use of University SCRS and Hospital SCC.

77. During orientation, the Law School admonished students to live like law students, not lawyers, suggesting money saving tips like bringing homemade sandwiches instead of buying lunch at restaurants.

<u>University</u>

78. The University was worth billions of dollars. According to its Form 990s, the University listed net assets of $5,290,184,714 in Year 1; $6,255,269,150 in Year 2; $4,796,993,000 in Year 3, and $5,137,642,000 in Year 4. In FY2020, the University's most recent publicly available tax form, it listed net assets of $7,223,970,958.

79. University executives were well compensated. One of the University's highest paid positions was the executive vice president of medical affairs overseeing UChicago Medicine ("UChicago Medicine EVP"). The University paid him $1,697,864 in Year 1; $1,064,833 in Year 2; $1,781,935 in Year 3; and $7,741,658 in Year 4.

<u>Law School</u>

80. When I enrolled, the Law School had recently ended a fundraising campaign marking its centennial, raising over $100 million. In addition, the Law School dean had discretionary funds to help students in need.

<u>Hospital</u>

81. The Hospital was worth billions of dollars. According to its Form 990s, the Hospital listed net assets of $909,217,781 in Year 1; $954,206,849 in Year 2; $822,744,572 in Year 3; and $940,591,736 in Year 4. The Hospital's most recent publicly available tax form was for FY2019, and it listed net assets of $1,887,715,502.

82. According to its Form 990s, the Hospital's highest paid "independent contractor" was the University. Again, to the best of my knowledge, the Hospital did not employ its own

doctors. Instead, it paid hundreds of millions of dollars per year in physician services fees to the University to use doctors employed by the University. The Hospital the University $105,269,000 in Year 1; $134,139,000 in Year 2; $149,018,000 in Year 3; and $165,948,750 in Year 4.

J. **Pyschological Scholarship**

83. Jennifer Freyd is a professor emeritus at the University of Oregon, a professor at Stanford University, and an expert on institutional betrayal and betrayal trauma theory.

84. According to Freyd, institutional betrayal consists of "wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to prevent or respond supportively to wrongdoings by individuals (e.g. sexual assault) committed within the context of the institution." Jennifer Freyd, Institutional Betrayal and Institutional Courage, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/.

85. Freyd explains institutional betrayal further,

> Institutional betrayal harms in at least two distinct ways: pragmatic and psychological. For instance, damage to citizens from avoidable government failure in managing covid19 is both pragmatic (illness, deaths, increased inequality, economic ruin) and psychological (leading to emotional and physical distress and thus more pragmatic harm). Institutional DARVO occurs when DARVO (Deny, Attack, Reverse Victim & Offender) is committed by an institution (or with institutional complicity) as when police charge rape victims with lying. Institutional DARVO is a particularly aggressive form of institutional betrayal. Id.

86. In other words, institutional betrayal consists of financial, physical, and psychological harms. DARVO is a type of institutional betrayal that is especially ruthless where victims are treated as villains. DARVO is used "to confuse and silence" victims, causing victims to engage in self-blame. Jennifer Freyd, <u>What is DARVO?</u>, https://dynamic.uoregon.edu/jjf/defineDARVO.html.

87. Freyd discusses the devastating physical and psychiatric effects of betrayal on victims,

Not all traumatic experiences are equal. Although all traumatic events have the potential to leave lasting scars, traumatic events that are interpersonal in nature tend to be most damaging (Briere & Spinazzola, 2005; Cloitre et al., 2009). Interpersonal traumas that involve betrayal of a trusted or depended upon relationship have been repeatedly shown to be uniquely harmful (Goldsmith, Freyd, & DePrince, 2012). Betrayal trauma theory (Freyd, 1994, 1996; Freyd et al., 2007) explains the unique posttraumatic sequelae of traumatic experiences that involve betrayal as stemming from the maintenance of attachment relationships necessary for survival. The clearest case of this is betrayal blindness—the state of being consciously unaware of interpersonal abuse committed by a trusted or depended upon other (Freyd, 1994, 1997). This blindness may be as extreme as a complete lack of memory of episodes of abuse or more minor such as the tendency to overlook indications of infidelity (Gobin & Freyd, 2009). Although it is typically maladaptive to remain unaware of these transgressions as it increases the likelihood they will reoccur, the need to maintain a necessary

relationship takes precedence (Gobin & Freyd, 2009; Goldsmith, Barlow, & Freyd, 2004).

A betrayed individual may maintain little or no conscious awareness of abuse, but the traumatic nature of these events cannot often be erased entirely. The effects of the abuse are instead made known by physical and psychological symptoms that are often perplexing and upsetting. Higher incidences of physical complaints such as irritable bowel syndrome, chronic pelvic pain, and musculoskeletal pain have been documented in individuals with a history of interpersonal abuse (Beck, Elzevier, Pelger, Putter, & Voorhamvan der Zalm, 2009; Ross, 2005), including those maintaining little or no memory of documented abuse (Courtois, 1997). The effects of this abuse are seen psychologically as dissociation, anxiety, depression (Briere & Spinazzola, 2005), and interpersonal difficulties that are sometimes extreme enough to fit a diagnosis of borderline personality disorder (Kaehler & Freyd, 2009; Trippany, Helm, & Simpson, 2006). Carly Parnitzke Smith and Jennifer J. Freyd, <u>Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma</u>, Journal of Traumatic Stress, February 2013, 119 (https://dynamic.uoregon.edu/jjf/articles/sf2013.pdf).

88. Bessel van der Kolk, a psychiatrist and researcher, is the author of the New York Times bestseller <u>The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma</u>, a book about trauma with a focus on post-traumatic stress disorder ("PTSD").

17

89. Van der Kolk's book discusses shellshock, a term coined during World War I which is both the precursor to PTSD as we now understand it and a form of PTSD. During World War I, soldiers were often diagnosed with shellshock when they were unable to function but where there were no obvious physical reasons for this. His book also discusses rape and incest, a type of rape where the victim is often dependent on the rapist for caregiving. This document refers to van der Kolk's writings throughout.

**K.  <u>Plaintiff's Personal History</u>**

90. In 1982, I was born in Hawaii, where I grew up on my family's farm. The closest town was 15 minutes away by car and had a population of approximately 900 people. Until I graduated from college, I lived and worked on our family farm, including picking fruit, pruning trees, and driving a tractor.

91. The federal government classified where I lived as a medically underserved area. In addition, I had public health insurance for low-income families through the Children's Health Insurance Program, commonly known as CHIP. Despite my circumstances, I always had access to adequate healthcare.

92. My mother was an immigrant from Japan. Beginning when I was a few months old, I regularly visited Japan to see my maternal grandparents, who were my only grandparents. They gave me a sense of stability that I otherwise would not have had. In 1987, I lived with them and attended kindergarten. This was how I learned to speak Japanese.

93. I grew up in a verbally and physically abusive household. One of my parents was an alcoholic, and both had outbursts and beat me. If I cried, I was forced to placate them, including apologizing and thanking them for teaching me a lesson.

94. I grew up worrying about money. My parents had constant money problems which they verbally, emotionally, and financially unloaded on me. This included using my savings account, which contained money our relatives gave me for birthdays and holidays, when they had financial shortfalls, which was often.

95. In June 1989, between the first and second grades, when I was seven years old, I was raped repeatedly by the 19-year-old son of my mother's childhood friend.

96. My mother learned about my rapes when she saw me crying, asked what had happened, and I told her that my rapist had done. She withheld the rapes from my father, who was away for work on another island, and allowed my rapist to continue to stay with us and be alone with me. After my father returned, she disclosed my rapes to him.

97. My father reported this matter to the police. After midnight, my parents pulled me out of bed to be questioned by the police, a Gestapo tactic they inflicted on their own child. When I wouldn't speak and started crying, the police officers ended the interview.

98. When I woke up the next morning, my rapist was gone. My parents said the police had taken him away.

99. That same day, my father drove me to the hospital for a medical examination. A police officer was there. I associated the police with being terrorized in the night. Since the police had taken my rapist away, I feared they could do the same thing to me.

100.     The medical examination evidenced that my rapist had torn three centimeters or about 1.2 inches of my hymen. However, when I was asked if my rapist had done this or had hurt me, I denied it. In other words, in a trauma situation where I experienced additional stressors, including believing I may be taken from my family and having my vagina touched by another stranger, I became scared and inconsistent. However, my affect and

behavior didn't change, and I didn't become euphoric, communicative, or concoct other information.

101.     My mother repeatedly punished me for my rapes, including refusing to speak to me and, when she finally did, blaming me for inciting my rapist based on a letter he left her. Although this letter was evidence, I don't think it was turned over to the police. According to the police report, my rapist's partial confession also contained accusations of incitement against me.

102.     Shortly thereafter, I went to Japan to visit my grandparents, where I experienced stability and felt safe and cared for.

103.     Van der Kolk explained that experiencing trauma does not inevitably lead to becoming traumatized, writing that adequate social support can potentially prevent traumatization. He wrote,

> Study after study shows that having a good support network constitutes the single most powerful protection against becoming traumatized. Safety and terror are incompatible. When we are terrified, nothing calms us down like the reassuring voice or the firm embrace of someone we trust.
>
> …After an acute trauma, like an assault, accident, or natural disaster, survivors require the presence of familiar people, faces, and voices; physical contact; food; shelter and a safe place; and time to sleep. It is critical to communicate with loved ones close and far and to reunite as soon as possible with family and friends in a place that feels safe. Our attachment bonds are our greatest protection against threat.

> …Traumatized human beings recover in the context of relationships: with
> families, loved ones, AA meetings, veterans' organizations, religious
> communities, or professional therapists. The role of those relationships is to
> provide physical and emotional safety, including safety from feeling
> shamed, admonished, or judged, and to bolster the courage to tolerate, face,
> and process of the reality of what has happened. Bessel van der Kolk, <u>The</u>
> <u>Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma</u>,
> (Penguin, 2015) at 212.

104.    He explained what social support was and what it was not, "Social support is not
the same as merely being in the presence of others. The critical issue is reciprocity: being
truly heard and seen by the people around us, feeling that we are held in someone else's
mind and heart." <u>Id</u>. at 81.

105.    He wrote, "The greatest hope for traumatized, abused, and neglected children is to
receive a good education in schools where they are seen and known, where they learn to
regulate themselves, and where they can develop a sense of agency. At their best, schools
can function as islands of safety in a chaotic world." <u>Id</u>. at 353.

106.    He defined "agency" as "the technical term for the feeling of being in charge of
your life: knowing where you stand, knowing that you have a say in what happens to you,
knowing that you have some ability to shape your circumstances." <u>Id</u>. at 97.

107.    At the time of the rapes, I was a student at a small country school that was part of
the Hawaii public school system, which was one of the lowest, if not the lowest, ranked
public school systems in this country. My school had nothing to do with my rapist or my
rapes and remained a safe place for me.

21

108.      My first, second, and third grade report cards are similar, indicating good grades and good behavior. The main difference between my report cards was that I improved each year. For example, before I was raped, in the first grade, I got 11 Es for excellent and two S+s for satisfactory plus. After I was raped, in the second grade, I got 12 Es and one S+. In the third grade, I got 13 E-level grades, including 11 E+s for excellent plus and two Es. In addition, my third-grade teacher called me "perfect" and "an ideal person in our group." Further, at the end of the third grade, when I was nine years-old, I skipped the fourth grade based on my national standardized test scores. **(Exhibit 10)**

109.      In other words, being raped was not fatal to my academic progress, personal development, or sense of agency.

110.      After graduating from college in 2003, I lived and worked in Japan for over three years. During that time, I regularly saw my grandparents, including spending holidays and vacations with them.

111.      Initially, I taught at a private language school. However, when my employer exploited me, including making me work without pay and unlawfully deducting money from my salary, I reported them to the Japanese government and recovered my money. This experience made me interested in law.

112.      Subsequently, I worked in an administrative role with a Big Four accounting firm in Tokyo for about two and a half years, where I was well-liked and well-respected. At this firm, my combined salary and bonus, which were paid in Japanese yen, was approximately $50,000 per year. During my employment, I saved approximately $15,000. I never took on credit card debt, any other debt, or experienced any financial problems.

113.     While living in Japan, I attended college alumni networking events. Through this, I learned about the existence of Big Law, the term for large law firms; the existence of a Big Law firm I refer to as Firm 1; and that Firm 1 had the largest non-Japanese legal practice in Japan.

114.     I also learned there was a scarcity of English and Japanese bilingual lawyers and that firms like Firm 1 offered bilingual lawyers who lived and worked in Japan compensation above and beyond already generous Big Law salaries, including housing and cost of living adjustments. Since I could only afford law school by borrowing money, I realized that practicing law in Japan would allow me to be near my grandparents and pay off my loans more quickly. Based on this, I thought going to law school made personal, professional, and financial sense.

115.     In 2005, I began applying to law schools. As part of my law school application, my superior, who read law at Oxford University, wrote me a recommendation, stating in part,

     I have found that she is very intelligent, has a creative mind, and is always

     seeking new challenges. She is very focused on what she wants and has a

     clear and efficient way of working with the ability to focus on the minutiae

     of detail but is also skilled at taking a high level view when required.

     **(Exhibit 11)**

116.     That same year, my parents demanded that I take out one or more credit card loans of $30,000 (or as much as I could get) in my name and lend them the money. Because I anticipated attending law school, I refused to do this. Instead, I offered them money from my savings account, which they refused. They accused me of being an ingrate and disowned me, leaving me an orphan.

117.    In 2006, I was accepted to many law schools, including the Law School, which was my top choice school.

118.    My grandparents, who I had always had a strong relationship with, a relationship which had developed further while I lived in Japan, were upset about my leaving. Before I left, I promised them that I would return to Japan to practice law and spend time with them.

119.    For the first twenty-four years of my life, I was resilient, overcame obstacles, met my goals, stood up for myself, and maintained a sense of agency.

120.    This would change after I entered the University, where I would be the victim of a catastrophic tumor, medical malpractice, fraud, and physical and psychological abuse beyond anything I had ever experienced in my life.

**L. Enrollment Facts (2006 – 2010)**

121.    In September 2006, I enrolled at the Law School. I was part of the Class of 2009, a three-year law degree program with anticipated graduation in June 2009.

122.    When I enrolled, I was already in decline due from the tumor, which was yet undiagnosed. This is discussed in greater detail later in this document.

123.    At the time of my enrollment, Saul Levmore, then in his late 50s, was the Law School dean. Levmore had three degrees, including a bachelor's degree from Columbia University and law and doctorate degrees from Yale University ("Yale").

124.    In Years 1 and 2, Levmore was friendly with me. This included inviting me to his office, where we met alone on multiple occasions. During one meeting, we looked at different places on Google Maps, which was then relatively new. When he asked me where I was from, I said Hawaii. When he asked me about visiting Hawaii, I told him my parents and I were estranged.

125.     During Year 1, I met all my academic obligations.

126.     During my first quarter examinations, my mother called to say that my grandfather, who had a heart condition, had been rushed to the hospital in an ambulance. Claiming he might die, she demanded that I buy her a plane ticket to see him. Ultimately, my grandfather lived, but I helped buy her a ticket anyway. After I did, for the first time, she asked me where I went to law school.

127.     During my first quarter examinations, I had tests for two classes. Both were graded on a curve where the average grade was a 177, which was equivalent to a B in a letter grading system. On these two exams, I received scores of 177 and 175 for an average of 176. This was a B-average and put me just below the average in my class.

128.     For ease of reference, in the rest of this document, I refer to the Law School's numeric grading system using their traditional letter equivalents.

129.     As the effects of my tumor worsened, my grades worsened. During the remainder of Year 1, I accumulated three Cs. In the past, I never even had one C. During my second academic year, I accumulated two Cs and one D. During my third academic year, which I took two academic years to complete, I accumulated six Cs. These grades do not include the three Fs I should have accumulated during my third academic year.

130.     Law school grades are important for a lawyer's career. In evaluating a job candidate, law firms and judges request and review her transcript. Good grades help and bad grades hurt a lawyer throughout her career.

131.     During the third quarter of Year 1, one of my professors arranged for me to get academic support for her class. She did this by contacting the dean of students, who represented the University in communications with students.

132.     The dean of students was Michele Richardson, a lawyer then in her late 40s. Richardson had a bachelor's degree from Brown University, a law degree from Yale, and had practiced law at Big Law firms. Richardson told us she would arrange this support.

133.     When Richardson and I met, she seemed friendly, asking me about my class and my background. Among other things, I told her I was from Hawaii, estranged from my parents, and had lived and worked in Japan, where my mother was from and where my grandparents lived.

134.     Subsequently, Richardson contacted me again. This time, she was totally different, and it was like speaking with a different person. She said she was revoking my academic support and that I was forbidden from telling my professor. Because Richardson was a lawyer and an authority figure, I assumed what she did was permissive, deferred to her, and did as she said. However, I found her changed behavior chilling and avoided her.

135.     During the summer of 2007, which was between Years 1 and 2, I worked as a research assistant to Zarfes, a lawyer then in his late 40s who was a teacher and administrator with the Law School. Zarfes had five degrees, including bachelor's and master's degrees from the University, a master's degree from Columbia University, a law degree from Yeshiva University, and a master's of law degree from New York University ("NYU"). Previously, Zarfes was of counsel with Orrick, the international Big Law firm, and before that for twelve years the general counsel with Cap Gemini Ernst & Young, the multinational consulting firm.

136.     During our interview, Zarfes asked me where I was from, and we talked about Hawaii, where he said he had stayed at the Four Seasons at Hualalai, an expensive resort.

When he asked if I had plans to go home for the summer, I said my parents and I were estranged.

137.     Beginning that summer, Zarfes and I developed a personal relationship based in trust. I told him about my parents, our relationship, and our financial circumstances. Zarfes, in turn, discussed personal information with me.

138.     Zarfes also helped me prepare for law firm interviews, treated me to coffee and meals, and because I didn't have a car, gave me rides in his car, a silver Mercedes. Based on our interactions, I reasonably came to consider him my mentor, friend, and confidant.

139.     Beginning that summer and continuing into the first quarter of Year 2, I participated in law firm recruiting. This was overseen by the Law School office of career services ("Career Services"), which organized the interviews. At the time, Career Services was headed by Abbie Willard, then in her 60s. Willard had three degrees, including a bachelor's degree, a master's degree, and a PhD in English literature from the University of Illinois-Urbana.

140.     Career Services helped me draft my resume, which it maintained and included my work experience in Japan and involvement in the Japan Law Society. It also helped me prepare for interviews, during which I discussed my intent to work in Japan and my desire to be near my Japanese grandparents.

141.     Under the typical career track for Law School students, between their first and second academic years, they interviewed for a Big Law internship. The internship took place during the summer between their second and third academic years. During these internships, law firms gave students easy assignments, wined and dined them, and took them on outings. Students, in turn, received an introduction to working at a law firm and

27

bonded with their intern classes. All or nearly all interns received offers of permanent employment, which were contingent on their continued enrollment at and graduation from their law schools. Law firms also provided students with stipends to study for and take the bar exam. After graduating, students began working as first-year associates, earning an annual salary of $160,000, plus benefits and an annual bonus. From there, students might stay with their firm and become partners or stay a few years before going to work for another firm, going in-house for a client or another company, going into the public sector, or changing industries, such as going into banking or consulting.

142.     During the recruiting process, I received many offers to interview or intern with many law firms. I accepted an offer with Firm 1 to intern with their New York and Tokyo offices. After graduating, I intended to practice law with Firm 1 for two or three years in New York, where the Law School, including Zarfes, said I would receive the best legal training, before transferring to the firm's Tokyo office.

143.     Under the terms of Firm 1's New York internship, interns worked in different practice areas. At the end of the internship, interns bid on the practice areas that they were interested in, and the practice areas, in turn, bid on the interns they were interested in. Based on this, interns received full-time offers from from specific practice areas.

144.     Under the terms of my Tokyo internship, Firm 1 would pay for my roundtrip flight to Japan and my housing.

145.     Zarfes and I discussed my offers, and I told him when I accepted Firm 1's offer to split my summer between their New York and Tokyo offices. I also submitted this information to Career Services.

146.     In Winter 2008, one of the classes I took was LAWS 68001, "Marriage," a three-academic-credit seminar. According to my transcript, I received three academic credits and one writing credit for this class. Since I received the writing credit in Year 2, which was two academic years before writing credits came to be defined as SRPs and non-SRPs, I could not receive an SRP for this paper.

147.     In January 2008, I began seeking medical care for a catastrophic tumor.

148.     By way of background, to be enrolled at the Law School, students needed to live in Chicago and have health insurance. Since the University student health insurance plan was the cheapest option available to me, I enrolled in it.

149.     Under the insurance plan, while students were within a certain radius of the school, which basically covered all of Chicago, they had to go to Hospital SCC. If Hospital SCC gave a student a referral to see a specialist, then the insurance provider would cover the cost of her care. If Hospital SCC didn't give her a referral and she went to a specialist anyway, then the insurance provider wouldn't cover the cost of her care.

150.     Again, I was expected to live on $19,000 a year, which was less than twice the federal poverty line. Under the Law School's homemade sandwich budget, I couldn't afford a sandwich someone else made, let alone potentially astronomical medical bills. Essentially, while taking classes, I was captive to Hospital SCC for medical care.

151.     Over three separate visits to Hospital SCC, I saw two medical professionals. Both failed to examine me or give me a referral despite my repeated requests.

152.     I also called my insurance company and explained my circumstances. They refused to pay for treatment without a referral.

153.    Since I didn't have a car and couldn't afford to pay for treatment out of pocket, I was helpless to get adequate medical care while in Illinois. To get adequate care, I would need to leave the state, which also cost money.

154.    The tumor was on my ovary, a female sex organ that is part of the endocrine system. The endocrine system produces and secretes hormones affecting many things, both sexual and non-sexual. These include mood, behavior, cognition, and personality.

155.    Due to the tumor, I would lose my ovary containing half of my lifetime eggs, which unlike sperm are finite in number. In addition, I lost the functioning of that organ, straining my remaining ovary and putting me at risk for early onset menopause.

156.    Further, I developed psychiatric and cognitive problems, including becoming suicidal and having difficulty reading.

157.    In January 2008, I also began seeking mental healthcare at University SCRS. **(Exhibit 12)**

158.    During my initial appointments in March 2008, I met separately with a licensed psychologist and a licensed psychiatrist. **(Exhibit 13)**

159.    They asked me open-ended questions; accepted my statements as the truth without judgement, argument, or threats; and maintained my confidences. I discussed my family, including my parents' financial problems, our estrangement, and their demands for money. According to the medical notes, my "affect" was "congruent," meaning I displayed appropriate emotions in discussing painful topics, such as tearing up about my parental estrangement or my paternal aunt having breast cancer.

160.    Over multiple sessions in March 2008, the psychiatrist diagnosed me with depression, anxiety, and dysthymia, a mood disorder like depression that requires at least

two years of symptoms. In other words, according to the University, by March 2006, which was half a year before I enrolled at the Law School, I was already in decline.

161.     The psychiatrist also prescribed me psychiatric medication, which I had never taken before. This medication changed the chemical makeup of my brain, further altering me. I was dependent on this medication for nearly a decade.

162.     When I met with the psychiatrist after undergoing surgery to remove the tumor, she said my mental conditions arose from a chemical imbalance induced by the tumor.

163.     Based on my personal relationship with Zarfes, I discussed my psychiatric diagnosis and treatment in confidence with him. He told me that he was in therapy, that he initially entered therapy for obsessive-compulsive disorder, and that he took psychiatric medication. Zarfes recommend that, in addition to continuing with my medication, I also undergo therapy.

164.     Other than Zarfes, I did not disclose or discuss my psychiatric diagnosis or treatment with anyone else employed by the Law School. To the best of my knowledge, at that time, Zarfes did not disclose my personal health information to anyone else employed by the Law School.

165.     During the Spring 2008 quarter, due to my worsening health, I enrolled in a reduced course load of three classes. (Under Law School academic policy, students could take three classes instead of the usual four classes for two quarters and still meet minimum credit requirements to graduate.) This was the first quarter I enrolled in a reduced course load.

166.     This quarter, I took Class A, a three-credit seminar taught by Professor A, a partner at a Big Law firm in Manhattan, and Class B, a three-credit seminar taught by Professor C, a faculty member. Again, Classes A and B had final papers Paper A and Paper B,

respectively, due in June 2008 that represented the entirety of their course's academic credits and grades.

167.     Between Years 2 and 3, in June 2008, while interning with Firm 1 in New York, I was finally able to get adequate healthcare, and my tumor was diagnosed. The diagnosing doctor, who was affiliated with NYU Langone, a top hospital, said I might have cancer, be barren, or die. Without further treatment, including surgery, he said there was no way to know if the tumor was cancerous, had metastasized, if I would recover, or how long my recovery may take. Assuming I recovered, he said it could take five or more years. I was 26 years-old. I was devastated.

168.     Based on his instructions, I arranged to leave Firm 1 with no intent to return, which the firm was understanding about.

169.     Other than Zarfes, who I trusted and considered a friend, I did not disclose my medical crisis to anyone at the Law School. This was because my doctor advised me against involving the Law School, which he worried was inexperienced in medical matters.

170.     I also arranged to undergo medical care. Although my doctor had referred me to a surgeon with NYU, I did not have a place to stay or anyone to care for me while I convalesced indefinitely in New York. As a result, my father's sister and cousin and their spouses, who lived in Maryland, offered to help. One couple said they knew a doctor who worked at Johns Hopkins, a top hospital, who could treat me. Both couples offered to let me stay with them.

171.     My relatives were dealing with breast cancer, ultimately terminal pancreatic cancer, stress-induced bipolar disorder, and business problems. They also had children and

grandchildren they were raising or helping to raise. While they could help me in a crisis, their ability to care for me was limited.

172.     My doctor told me the Hospital had committed malpractice. However, due to my limited mental and emotional bandwidth, prioritizing my health, and not being in Chicago, I did not consult an Illinois medical malpractice lawyer. As a result, I did not know that, under Illinois law, the two-year statute of limitations ("SOL") on my medical malpractice claims had started to run; the legal test for medical malpractice claims, which was duty, breach, damages, and causation; or what evidence would be relevant in assessing damages, such as statements or acts, including returning to my internship or receiving a job offer.

173.     Due to my financial circumstances, my ability to get adequate healthcare was totally dependent on medical malpractice damages. To convalesce, I needed medical malpractice damages to pay for basic necessities like food and shelter. Had I been allowed to follow my doctor's medical orders, I would have received money necessary for my recovery. Were I unable to pursue a law career, I also would have received compensation for this, allowing me to repay the student loans I had already borrowed, and would not have taken out additional federal student loans for my law school education.

174.     However, because of the University's corruption and greed, I was unable to receive damages or healthcare. Instead of helping me, the University and its employees, whose salaries and services I paid for, betrayed me. The University's institutional betrayal was financial and psychological, which were intertwined. I give a broad overview of what the University did before delving into the specifics.

175.     The financial betrayal included depriving me of medical malpractice damages against the Hospital and tuition and fees the University and Hospital would have foregone

had my enrollment ended. The University did this by hiding my economic damages during the SOL on medical malpractice claims, then covering up its fraud, which is ongoing to this day.

176.     First, the University manipulated the outcome of my summer. This included withholding a paper extension, putting me in a position of financial and emotional duress, unless I agreed to return to my internship post-surgery. After I returned to my internship, I tried to leave, but the University made me stay. The University also communicated with Firm 1 without my prior knowledge or consent to secure an offer for a job I obviously could not do, then pressured me to accept it. Since the job with Firm 1 was contingent on my graduating from the Law School, this locked me into continuing my enrollment, guaranteeing the University and Hospital my tuition and fee revenue.

177.     Second, the University manipulated and falsified my academic performance and records. While I lacked good standing or the ability to do satisfactory work, which the Law School privately acknowledged, it continued my enrollment and even tried to expedite my graduation. It also issued grades, credits, transcripts, and a law degree in violation of its own academic policies.

178.     Essentially, the University manufactured a false professional and academic record that the tumor hadn't affected me at all.

179.     However, in fact, the tumor had devastated me. I couldn't even hold down an internship where an employer created easy assignments for me. Holding down a real job was out of the question. In addition, I didn't have parents to care for me, a home to go to, or family money. As a result, without medical malpractice damages, I couldn't afford to support myself while I convalesced indefinitely, and the only way I could repay my federal

student loans was by practicing law. To pay for basic living expenses and to practice law, I needed to stay in school and take out more loans.

180.     Essentially, by manufacturing a false record, the Law School set and ensnared me in a debt trap, made me its captive, and deprived me of all damages.

181.     The psychological betrayal included mentally, emotionally, and physically brutalizing me for years, including depriving me of healthcare; interfering with my family relationships and support system; and turning school, which had been a safe place for me my whole life, into a terrifying one. At the Law School, I was trapping me with my abusers, who I was forced placate and please (or try to anyway) to avoid further abuse; was gaslighted and confused; forced into situations where I could not succeed; and publicly and privately humiliated. This caused confusion, an inability to trust myself, shame, feelings of failure and inadequacy, and self-blame. This also caused me to feel helpless, unsympathetic, and untrustworthy, things I struggle with to this day.

182.     To use van der Kolk's language, the University destroyed my sense of agency and murdered my soul. Bessel van der Kolk, The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma, (Penguin Publishing Group, 2015) at 136 ("In order to know who we are – to have an identity – we must know (or at least feel that we know) what is and what was "real." We must observe what we see around us and label it correctly; we must also be able to trust our memories and be able to tell them apart from our imagination. Losing the ability to make these distinctions is one sign of what psychoanalyst William Niederland called "soul murder." Erasing awareness and cultivating denial are often essential to survival, but the price is that you lose track of who you are, of what you are feeling, and of what and whom you can trust.")

183.     When Professor A contacted me about Paper A, I asked for an extension based on medical reasons, which he was understanding about. **(Exhibit 14)** Zarfes was aware of and involved in my communications.

184.     As van der Kolk wrote, in traumatic situations, people reach out and "cling" to those closest to them. Id. at 13. I reached out and clung to Zarfes, who maintained a residence in Manhattan and was in Manhattan that summer. Based on our personal relationship, I disclosed the details of my medical condition to him in confidence. I didn't tell my parents or anyone else at the University, not even my psychiatrist, about my medical crisis. This was how close I considered our relationship to be and how completely I trusted him.

185.     Zarfes and I spoke on the phone and met in person for breakfast. During this meal, he asked me if I intended to return to the Law School in the fall, which I could not commit to. He also pressured me to disclose my medical condition to the Law School, which I refused, explaining my doctor's order. When Zarfes could not elicit my consent, he changed tactics, asking if there was anything else that I needed from the Law School. When I said no, he told me to think and seemed agitated. I remembered that Paper B was due and that I also needed a paper extension from Professor B.

186.     Zarfes said he would arrange the paper extension, and I understood that he would communicate with Professor B on my behalf without disclosing the details of my medical condition. However, Zarfes didn't contact Professor B at all. Instead, Zarfes used my paper extension as a pretext to disclose the details of my medical condition to many members of the Law School administration. To do this, Zarfes used his University email account to send interstate wire communications between New York and Illinois. **(Exhibit 15)**

187.     The administrators he contacted included Levmore, Richardson, Willard, and an employee I refer to as Administrator 1, who was also a lawyer and a Law School graduate.

188.     To be clear, Zarfes did not disclose my medical condition to request an academic accommodation for me. Rather, Zarfes requested an academic accommodation to disclose my medical condition.

189.     In his email, Zarfes claimed he was disclosing my medical condition because I asked for help with a paper extension that he didn't think was appropriate for him to arrange. Again, he offered to help me academically, and but for this offer, I would not have asked him to arrange the extension for Paper B. Further, if in fact he thought my request had been inappropriate, then he could have told me so and refused to pursue it.

190.     In addition, he went into far more detail about my medical condition than he knew I was comfortable sharing or was necessary for what he called a "mundane" paper extension. Further, he falsely claimed he thought I would want to speak with Richardson, which he knew was untrue, and included Career Services, which had nothing to do with my paper extension.

191.     In this email, Zarfes described me as being "shell shocked," again a serious psychiatric condition.

192.     Zarfes did this one business day before what would have otherwise been the last day of my internship with Firm 1, just when I was on the cusp of seeing my relatives and becoming less dependent on him.

193.     On the evening of the disclosure, Zarfes called to tell me that he had disclosed my medical crisis to the Law School. When I became angry and upset, he argued with me and

hung up. I felt abandoned and punished. Given my relationship with my parents, this was triggering and destabilizing.

194.     The next day, Zarfes emailed me, acted as if this interaction never happened, claimed he had only disclosed that I was having surgery, and pressured me to accept this. I interpreted his behavior to mean that if I accepted his disclosure, which he claimed was more limited than what he had said the night before, then I could have our relationship back, which I was desperate for. As a result, I felt I had no choice but to accept this.

195.     That same day, Richardson, Willard, and Administrator 1 emailed Zarfes. They thanked him for telling them the details of my private medical crisis as if they were entitled to it. No one asked if I had consented to the disclosure.

196.     According to the record, Levmore also failed to ask if I had consented to disclosure.

197.     Although Zarfes described me as shellshocked, the University did not consult a qualified medical professional.

198.     When Zarfes admitted to Richardson that I hadn't consented to the disclosure, she did not tell me this, forward his emails to me, or pursue discipline of him. Instead, they conspired to cover up the extent of his disclosure. **(Exhibit 16)**

199.     Further, although Richardson knew or should have known Zarfes was dishonest, she did not question the contents of his email, including his false claim that I would want to speak with her.

200.     Richardson, copying Zarfes and Administrator 1, wrote me across state lines claiming to want to "assist" me "whatever way possible" and that, if I wanted the paper extension, I had to contact her or her office. When I did not contact her, Zarfes pressured me to do so. **(Exhibit 17)**

201.     The paper extension was worth thousands of dollars to me, putting me in a position of financial duress. In addition, I had never failed a class, and the thought of doing so was terrifying. I called the Law School and spoke with Richardson and Administator1.

202.     During this conversation, Richardson interrogated me and made me discuss many topics, including those which I said I did not want to talk about. This included the details of my medical crisis, whether I had gone to the Hospital SCC, my internship, and my family. In addition, Richardson asked leading questions, was argumentative, financially threatened me, and gaslighted and shamed me.

203.     When Richardson asked about my crisis, I initially told her I was having major abdominal surgery and did not know if or when I would recover. When she asked for details about my medical crisis, I refused to disclose this. Instead, I explained that my doctor advised me not to involve the Law School due to his concern that they were inexperienced in medical matters. However, she claimed the Law School administration was experienced in medical matters and that she could not give me the extension without this information. Based on this, I was led to believe that Law School administrators had medical expertise and that I needed to disclose information subject to doctor-patient privilege for the paper extension.

204.     As I told them the details of my crisis, Richardson kept saying "I heard that" as though people were talking about me. Since I hadn't told anyone at the Law School except Zarfes, this was confusing, scary, and humiliating and further traumatized and destabilized me. I realize now, based on emails produced to me, that she was trying to conceal Zarfes's disclosure. When I finally asked who was talking about me, Richardson fell silent. Administrator 1 said Zarfes had disclosed this. However, due to my traumatized state,

including having racing thoughts, I did not always remember what she said and thought people were talking about me.

205.     When Richardson asked if I had gone to Hospital SCC, I said that I had.

206.     When Richardson asked about my internship, I explained my doctor said I wouldn't be able to work that summer.

207.     Richardson repeatedly asked about my prognosis and when I would be "fine." When I said my doctor said there was no way to know without treatment and that recovery could take five years, Richardson claimed my doctor said I would be "fine" five weeks post-surgery. This happened to be around when I was scheduled to begin my internship in Japan. Not knowing Richardson was dishonest, I believed her, doubted myself, and adopted and internalized her claim.

208.     Continuing to withhold my paper extension, Richardson asked if I had made arrangements with Firm 1 regarding my medical crises. I said yes, that I had arranged to leave. She responded that I had failed to make arrangements because I hadn't arranged my return. She said I needed to go back to Firm 1 and ask them to let me return to the New York office, which she substituted for Tokyo. I felt criticized and scared that I had done something wrong and that this would jeopardize my extension.

209.     Richardson also asked if I had a "loving family." When I said no and again explained my estrangement, she argued with me, insisting that my paternal relatives in Maryland were my "loving family." Again, she made me feel criticized, and I adopted her position and "loving family" phrase.

210.     During this, Administrator 1 never disputed anything Richardson said, reinforcing that Richardson's behavior was lawful and appropriate.

211.     During that summer and for the rest of my enrollment, neither Richardson, Administrator 1, nor anyone else employed by the University communicated with my parents.

212.     In addition, Richardson and Administrator 1 did not ask for a doctor's note confirming that I would be "fine" five weeks post-surgery. Had they asked for such a note, my doctor would not have issued one.

213.     Richardson and Administrator 1 said they were "caring," that I was "lucky" that Zarfes had told them about my medical condition, and that I should thank him, which I did. Based on this, I felt I needed to express gratitude and positivity if I were to receive or maintain my paper extension and their good graces.

214.     Richardson pressured me to communicate with Willard, which I felt I had to agree to.

215.     Richardson contacted Professor B about my paper extensions. According to her own email, the details of my medical condition or providing a recovery deadline were unnecessary for the paper extension. In addition, according to her, extensions were usually equivalent to time lost due to illness. **(Exhibit 18)**

216.     After this call, my behavior totally changed. I became psychotic, delusional, manic, and euphoric and made a humiliating spectacle of myself. This included being in denial about the severity of my condition and, where I had been private about my condition, publicizing it by email, including among people who were not my friends but who I was convinced were talking about me.

217.     This was also completely different from when I was raped, subjected to a Gestapo tactic, had my vagina examined by a stranger, and thought the police might take me away

from my family. The I merely denied being raped. My affect and behavior didn't change, and I didn't become effusive or talkative, claim I was "fine," or concoct other information.

218.      Because of Richardson's demand that I return to the Firm 1 in New York and Administrator 1's failure to intercede on my behalf, not only was I prohibited from seeing my grandparents or visiting Japan that summer, but I lost touch with them for over a year. By way of background, I had initially put off telling my grandparents about my health crisis due to my grandfather's heart condition and the language barrier between my relatives (my grandparents didn't speak English, and my paternal relatives didn't speak Japanese). Once in Maryland, I intended to find a translator, then to disclose my crisis and these arrangements to my grandparents. However, because Richardson made me return to New York post-surgery, I didn't know how to explain to my grandparents why I wouldn't be going to Japan, as I had promised them, if I was supposed to be "fine" by the time the Tokyo internship was supposed to begin. Before this summer, my grandparents and I spoke regularly, but when they called me that summer and over the next year, I didn't pick up the phone. During this time, my grandparents also started sending me letters saying they were worried about me, which I also left unanswered. **(Exhibit 19)** My shame, first about failing to go to Japan as I had promised them, then about avoiding them, snowballed and caused me to be unable to face them for over a year.

219.      When I arrived in Maryland, I discovered my relatives, who again were going through personal hardships, were mistaken, and their friend did not work at Johns Hopkins but at a different, much lower ranked hospital. Had I insisted on treatment at Johns Hopkins, this would have delayed the University's timetable for recovery, and I wouldn't have been

able to return to Firm 1 in time. Because I was scared Richardson would revoke the paper extension, I was forced to receive treatment at a hospital where I did not want to go.

220.     That month, I underwent surgery. I was slit from sternum to pelvis, the two halves of my stomach pried open and clamped, and the tumor, which by then had grown to 11 pounds and destroyed my ovary, removed. I was then glued and sewn back together, leaving me maimed and disfigured with a nearly foot-long scar. **(Exhibit 20)**

221.     For about six weeks, including one week of pre-surgery testing and five weeks of post-surgery bedrest, I stayed with my relatives, who I was shuttled between.

222.     Although my relatives told my parents about my health crisis, my parents never contacted me.

223.     My surgeon directed me to undergo therapy. During this time, I attempted to do so. However, due to incapacity, I couldn't arrange this. **(Exhibit 21)**

224.     During this time, instead of resting while I healed, I spent it terrified Richardson would revoke my paper extension if I didn't return to Firm 1 and forced myself to go on strenuous walks in the summer heat and humidity to try to recover my physical stamina.

225.     Due to stress, my mood swings continued.

226.     Due to stress, I also starting shopping online and, where I had been a saver, spending money basically uncontrollably, a symptom of mania and bipolar disorder.

227.     Weeks after undergoing surgery, I was forced to leave my support system to work in a place where I didn't have any close relatives.

228.     Because Firm 1's formal internship program was over, I could not work for or learn about different departments. Instead, I could only work for a department where a Law

School graduate was a senior partner. Due to the nature of this group's work, it would be particularly hard-hit by the Great Recession.

229.     I was nowhere near physically or mentally recovered. I didn't have a regular menstrual cycle, and my wound was still healing, which left me exhausted and in pain. As a result, I was tired by the time I got to the office and could not even work 9 to 5, hours far short of the time commitment expected of full-time lawyers.

230.     I also suffered from diminished reading comprehension, which was terrifying and worsened my ability to trust myself. I recall one assignment where I spent hours doing research only to realize that I had printed and read the same document over and over without understanding it. Needless to say, I failed to submit assignments.

231.     Further, I was unprofessional and inappropriate, including offering to show pictures taken during my surgery, which I did out a desperate need to talk about what had happened to me. Two lawyers told me my behavior made them and others at the firm uncomfortable.

232.     The entire experience left me feeling confused, humiliated, and like a failure.

233.     On top of all this, returning to Firm 1 in New York was a financial burden. First, I had to return the money Firm 1 had already paid me for the summer as what would have been a generous parting gesture and re-earn it. Second, I incurred living and travel expenses that I didn't have while staying with relatives or that Firm 1 would have covered had I interned in Tokyo. Third, my spending sprees worsened. Fourth, I lost track of hospital bills, hurting my credit.

234.     Simultaneously, the Law School, including Willard and Zarfes communicated with Firm 1 without my prior knowledge or consent. In doing so, they discovered Firm 1 was against giving me a permanent offer of employment due to my poor performance,

something I didn't know. When Willard contacted me about my internship, I said I wanted to leave because it was too hard and wanted to go to Japan, where I was originally supposed to intern and see my grandparents. Willard scolded me and demanded I stay. I felt criticized and confused. I was also scared that, if I didn't stay at my internship, Willard would tell Richardson, and Richardson would revoke my paper extension.

235.     Further, the University, including Zarfes and Willard, communicated with Firm 1 and secured an offer for a job that was beyond my abilities. Firm 1 reluctantly gave me an offer, which Willard and Zarfes pressured me to accept. Since the offer was contingent on my graduation from the Law School, this locked me into continuing my enrollment.

236.     To return to the Law School, I borrowed federal student loans, which the University processed and distributed, paying itself and the Hospital my tuition and fees. I also entered into an apartment lease in Chicago, where I also didn't have any close relatives.

237.     Upon returning, I met with Richardson and Administrator 1. Richardson said she had summoned the head of Hospital SCC to her office, told her what had happened to me, and arranged for me to get referrals more easily. I was surprised that Richardson had disclosed my crisis to the Hospital without my prior knowledge or consent, essentially alerting them to a potential medical malpractice lawsuit, but was told it was to help me. Again, Richardson was a lawyer and an authority figure, so I believed her behavior was appropriate. Administrator 1's silence reinforced this.

238.     The head of Hospital SCC subsequently contacted me to ask about my experience there. Because she was employed by the Hospital, which I had timely claims against, I didn't meet with her about this.

239.     When I met with Willard, she was mad at me about my performance at my internship and made me feel criticized.

240.     In Year 3, in Fall 2008, I again took a reduced course load of three classes. During this quarter, I failed to meet my academic obligations for all my classes. This included failing to attend classes, to submit my final paper on time for one class, or to submit many assignments for the other two classes, giving rise to two more incompletes. I also failed to submit Papers A and B.

241.     A professor discovered my medical crisis through Law School gossip and referred me to a lawyer with Corboy and Demetrio, then Chicago's top personal injury law firm. However, the lawyer (and later other lawyers) declined to represent me based on contingency, which was the only way I could afford to hire a lawyer or file a lawsuit. He explained this was due to the lack of readily apparent economic damages based on having a law firm offer and being enrolled in school. He explained that my reproductive health damages alone were too amorphous or minimal for him to take my case given that I still had one ovary, was only 26 years-old, and may have children long before my early menopause set in. Similarly, my physical scarring alone was not worth enough money for him to represent me. In other words, by concealing my economic damages, the Law School robbed me of the ability to recovery all damages.

242.     During this quarter, I returned to the University SCC for psychiatric care, where the psychiatrist who failed to notice or diagnose my tumor continued to treat me.

243.     I told her that since I no longer had the tumor, I wanted to stop taking psychiatric medication. She agreed to wean me off the medication. However, this was unsuccessful due to the stress and difficulty of school, which was beyond my capacity and where I should

not have been enrolled. Had I been convalescing instead of working or studying, I could have stopped taking this medication. Instead, I became dependent on it for nearly a decade. In fact, to this day, I take psychiatric medication.

244.     This was completely different from when I was raped. At the time, I did not suffer mental illness, was not medicated for mental illness, and did not have any academic problems. In fact, post-rape, my academic performance improved.

245.     At University SCRS, I was entitled to ten free therapy sessions with a licensed therapist. University SCRS helped me start to speak for myself again and rediscover and rearticulate my devastation. In addition, it created years' worth of medical records documenting my devastation, deterioration, and changed state, a small portion of which I have included as exhibits to this complaint. These exhibits and other records evidenced my becoming increasingly suicidal, including engaging in vivid suicidal ideation, such as considering different ways to kill myself and whether to leave a suicide note; being unable to manage my time; and even speaking differently.

246.     These notes also reflected the Law School's influence. For example, my psychiatrist noted my "affect" was "incongruent with limited range," that I had "an inability to tolerate sadness and anger," and that I had "characterlogic vulnerabilities." This meant I had clinically inappropriate emotional responses in discussing various topics , could no longer express a full range of emotions, and blamed myself. This was totally different from my initial psychiatric records.

247.     This occurred because of the University's handling of my crisis and its implementation of DARVO, including causing me to believe that I should be "fine" weeks

post-surgery; punishing me for not being "fine;" and making me feel criticized, defective, dishonest, and like a failure.

248.     The Law School administration knew I was traumatized by my medical crisis and arranged multiple emergency psychiatric sessions for me.

249.     Initially, when I reported that I had stopped attending class, Richardson arranged a session for me. She suggested I see a different therapist, one who wouldn't encourage me to discuss my devastation. Since Richardson was an authority figure who claimed to have medical expertise, I took her advice seriously. When I spoke to my psychiatrist about this, she criticized me, and this hurt our relationship. **(Exhibit 22)**

250.      Later, when I requested academic support, Richardson punished me, including yelling and pointing at me like I was a bad dog, claiming I was "fine," and threatening my enrollment. Administrator 1 was in this meeting but failed to intervene.

251.     When I reported this to Zarfes, including reminding him that he put me in touch with Richardson to begin with, he also punished me. Zarfes's affect and body language totally changed, and he became like a different person. He yelled at me, called me an ingrate, and refused to intercede. When I could work up the courage for it, I would continue to complain to him about her behavior for the duration of my enrollment to no effect.

252.     I also reported Richardson to Willard, who refused to help and told me I had to be patient with Richardson because she had a son with a learning disability and didn't have sufficient support from Administrator 1, who was usually pregnant or on maternity leave.

253.     Willard also diagnosed me as having a cognitive dysfunction induced by general anesthesia used during my surgery, which she said she had suffered from in the past. She said the reason I couldn't understand or fulfill my internship assignments was this medical

condition. Because undergoing reconstructive surgery on my scar would require general anesthesia, Willard forbade me from doing this. Again, because the Law School administration claimed to have medical expertise and because they were authority figures, I believed and relied on Willard's diagnosis and advice.

254.     I now understand that my lack of reading comprehension was not necessarily caused by general anesthesia and could have arisen from acute stress, depression, or other psychiatric conditions.

255.     My insurance would only pay for reconstructive surgery during the two years following the surgery to remove the tumor. Because I wasn't allowed to undergo reconstructive surgery during this time, I could not afford this surgery. As a result, I still have excess scar tissue, and when I stretch my back, it pulls and hurts. In addition, I am self-conscious about my scar and have never worn a bikini since.

256.     Unlike my aunt with breast cancer, who underwent a double mastectomy and reconstructive breast surgery, the University deprived me of decision-making authority over my own body where lifesaving medical treatment disfigured me.

257.     Willard also asked me if I had a "loving family." When I explained my parental estrangement, she told me I had a "loving family" and looked exasperated.

258.     When I reported Willard to Zarfes, he asked if she had yelled at me. When I said no, Zarfes said that if someone didn't yell at me, then I had to say they were being "really nice." Based on this, I claimed administrators were "really nice" and falsified our interactions. If I didn't do this, I was scared I would lose my relationship with Zarfes, which I was even more desperate for given how criticized and alone I felt.

259.    Due to Richardson's behavior, I asked Administrator 1 if I could be reassigned to her. She agreed and told me I was not the first student to request this. Administrator 1 also arranged an emergency psychiatric session for me. **(Exhibit 23)**

260.    Administrator 1 also punished and victim-blamed me. During an interaction, she told me that her grandfather had become depressed when her grandmother died but overcame his depression by deciding not to be depressed anymore. She told me that, like him, I needed to decide not to be mentally ill anymore as though being mentally were a voluntary choice I had made. She refused to provide academic support. Because she didn't yell at me or claim I was "fine," she was the nice one.

261.    Levmore shunned me for the rest of my enrollment. This included recoiling when our eyes met as we passed each other in a hallway; while he stood waiting for the elevator, turning away when he saw me; and upon seeing me as he left a room, turning around and walking right back in. I felt confused, hurt, and rejected.

262.    My therapist brought up taking a medical leave of absence, which I discussed with family and friends over the winter break. Based on this, I decided to take medical leave.

263.    My medical leave made it impossible for me to graduate in June 2009. Instead, the soonest I could graduate became December 2009.

264.    When I told the Law School, including Willard and Zarfes, that I wanted to take medical leave, they discouraged me from doing so. Richardson also discouraged this before relenting and telling me about voluntarily leaving the workforce after the birth of her first child while her doctor husband supported them financially. Reminding me that she went to Brown and Yale Law, she claimed she could have been a professor if she had not taken

this time off. Listening to her gloat about her fertility and financial freedom made me feel invisible, but because she didn't yell at me, I had to claim she was "really nice."

265.     In Winter 2009, I took a medical leave of absence at great personal expense. This was all the time to convalesce that I could afford without medical malpractice damages. Despite not taking any classes, I failed to submit assignments for any of my now four incompletes. This was in part because I was scared to go to school or the library, where I was scared to see Richardson; having never had an incomplete in my life, feeling like a failure for having four; and the Law School refused to give me academic support.

266.     During my medical leave, I caught up on my unpaid medical bills from the past summer, which had been sent to two households in Maryland, my temporary address in New York, and my apartment in Chicago. While reviewing and paying my medical bills, I discovered a bill with a co-pay of a few dollars was so delinquent that it had been sent out for collection, which hurt my credit.

267.     During my medical leave, Zarfes told me to "get over it" and discouraged me from pursuing therapy.

268.     During my medical leave, I used up what was left of my ten free sessions at University SCRS and was referred to a therapist. **(Exhibit 24)** I had to pay for our sessions out-of-pocket.

269.     Although the Law School had previously discouraged my medical leave of absence and agreed to a one-quarter leave, when I attempted to return, Richardson denied my reenrollment unless I agreed to ongoing therapy, which I had to pay for, and let her contact my therapist, again invading the privacy of my medical treatment. Although my therapist and I had discussed suspending our weekly therapy sessions, which I often found draining,

I was unable to do this. Essentially, the Law School again made it impossible for me to make my own decisions about my medical care and increased my cost of attendance. I felt punished for taking a medical leave of absence and for being enrolled, both of which the University had suggested or encouraged.

270.     In Spring 2009, despite a failed internship and now four incompletes, the Law School enrolled me and processed and distributed my federal student loans, including paying itself and the Hospital my tuition and fees.

271.     Since I had already enrolled in a reduced course load of three classes for two quarters, I had to take four classes that quarter. In consultation with the Law School, I took a class with Zarfes, an easy grader, and three classes with exams that I just needed to show up for rather than papers I might fail to submit. Essentially, the Law School limited what classes I took to conceal my incapacity.

272.     Administrator 1 went on maternity leave again, forcing me back to Richardson.

273.     Due to anxiety, including fear of not understanding what I had read, I asked my professors not to call on me in class. As a result, Richardson punished me. This included pointing at me and saying she needed to speak with me in the hallway, causing professors and classmates to stare; yelling at me in her office that I didn't need such accommodation; threatening my enrollment; making me get a doctor's note from University SCRS that I did not need such accommodation; and making me regularly meet with her.

274.     When I told my psychiatrist about Richardson's behavior, she looked at me like I was disturbed and asked why I thought Richardson would mistreat me. It was like reporting being raped and, instead of being asked about the rapist's actions, being asked to provide their motivation. I was stunned.

275.     My psychiatrist claimed Richardson denied my request as exposure therapy wherein patients who fear objects, activities, or situations are forced to confront their fears. Essentially, my psychiatrist dismissed Richardson's abusiveness, imputed knowledge of psychology to her, and normalized University employees outside of University SCRS purportedly practicing medicine on students.

276.     Meanwhile, Richardson, Willard, and Zarfes mocked and disparaged me among each other and to my professors. Zarfes called me "clueless" and wrote that Richardson and Willard agreed with this assessment. **(Exhibit 25)**

277.     Richardson gratuitously disclosed that I had previously failed to meet my academic requirements. Similarly, Zarfes gratuitously disclosed my poor performance at my internship, stating that, but for his intervention, I would not have received an offer. He claimed that he intervened to "help" me, a ruse that he and his co-conspirators also used on me.

278.     After I told my bankruptcy professor that my parents were going through bankruptcy, Zarfes and Richardson ambushed me and made me deny my financial circumstances.

279.     In May 2009, Firm 1 told me that my employment had been deferred, offering payment of $5,000 per month and a health insurance stipend during the deferral period. The firm offered two starting dates – April 2010 or September 2010. I preferred the later date because it would allow me to graduate in June 2010, which would give me more time to recover and to complete my academic obligations. However, Willard and Zarfes made me take the earlier date, attempting to accelerate my graduation and necessitating that I take the February 2010 bar examination.

280.     During this quarter, Professor A offered the same seminar I had taken with him the year before, again allowing his students to submit their papers in June.

281.     That summer, Professor A passed away.

282.     That summer, with the help of my therapist, I was finally able to work up the courage to contact my grandparents and visit them in Japan.

283.     In Fall 2009, which was in Year 4, I signed an apartment lease in Chicago.

284.     In Fall 2009, the Law School enrolled me and processed and distributed my federal student loans, including paying itself and the Hospital my tuition and fees.

285.     When I met with Richardson and Administrator 1, Richardson claimed that, with Professor A's death, grading his students' papers had fallen to Levmore and that Levmore had refused to accept mine because it was over a year late. She then claimed that she had convinced him to accept it.

286.     At the time, I was puzzled by Richardson's claim for many reasons. One was that immediately before discussing Paper A, Richardson displayed totally different attitudes toward my Japanese grandparents, who I said I visited, compared with my white relatives. First, Richardson failed to call my Japanese grandparents my "loving family." Second, she acted as though she had smelled something disgusting, including making a face, sniffing, and looking away. While I had had many humiliating interactions with Richardson, this was the first time she had acted like something smelled disgusting. It struck me as strange that she would help someone with a racial background that disgusted her.

287.     When I told Zarfes about Richardson's racist behavior and her claim of supposedly arranging for Levmore to accept Paper A, he became enraged, accused me of being an ingrate, and stormed off, abandoning me.

288.     Based on emails arising from Professor A's death **(Exhibit 26)**, I now believe the University accepted Paper A in violation of academic policies capping paper extensions at one year or some other standard that I failed to meet. In these emails, the Law School discussed outstanding papers from Professor A's Spring 2009 class. When Levmore expressed ignorance about certain specifics about these papers, he suggested contacting students who had taken that class.

289.     However, when Zarfes wrote that my Paper A from Spring 2008 was still outstanding, Levmore failed to contact me or to direct a subordinate to contact me. Instead, it appears Zarfes wrote an email that the University redacted in its entirety under a claim of privilege. As far as I know, the only material difference between my paper and those of the other students was how long mine was outstanding.

290.     After reviewing these emails, which the University produced in March 2017, I asked the University if there was a cap on paper extensions and, if so, what it was. The University refused to tell me.

291.     When I returned from Japan, I also met with Willard. When I told her about visiting my grandparents, she started at me stone-faced. This was also completely different from her attitude toward my white relatives, who she insisted were my "loving family."

292.     Again, according to Freyd, interpersonal betrayal and abuse can result in physical ailments. During this quarter, I developed a chronic medical condition that blinded me for hours at a time. I sought care from four medical professionals at two hospitals, including three at the Hospital and one at Northwestern University ("Northwestern"), where I finally received adequate healthcare, underwent testing (including bloodwork), and was given many prescription and over-the-counter medications.

293.     When I missed class and a meeting with Richardson due to my doctor's orders to stay home, she demanded a doctor's note. When I brought one, she reminded me that she was married to a doctor and accused me of lying. On top of my fear of permanently losing my eyesight, because the Hospital had also dismissed a medical condition resulting in an 11-pound tumor, this was triggering. This caused my anxiety to worsen, for me to abandon my email account on and off, and to be even more scared of Richardson.

294.     During this quarter, in discussion with Richardson, I took four classes, which I again failed to meet my academic obligations for. Three courses had final exams. Again, the Law School preferred that I take classes with exams rather than assignments because I could just show up for the exams and get bad grades rather than fail to submit assignments and get no grades.

295.     However, because I still needed one writing credit, including an SRP, a new requirement, I needed a class where I could submit a paper. I was interested in taking Class C, which was taught by two lawyers, one whom I refer to as Professor C. Both worked at a Big Law firm I refer to as Firm C. Again, the course was worth three credits, with class attendance and participation being worth two credits and Paper C being worth one credit. Because Class C was taught by lecturers in law, Paper C could not qualify for an SRP. I discussed this with Richardson, she said not to worry about the SRP requirement. Again, because she was a lawyer and authority figure, I assumed this was permissive.

296.     In January 2010, I submitted Paper C to my Professor C. However, because it was late and because I had failed to respond to her emails, she refused to accept or grade the paper. In the meantime, I was supposed to take the bar the following month and start

56

working at Firm 1 in April, which Willard and Zarfes had made me do. As such, I asked Zarfes for help with Paper C, which he agreed to grade.

297.     I also sought help from Schill, the Law School dean who succeeded Levmore. Schill was a lawyer admitted to New York who had a bachelor's degree from Princeton University and a law degree from Yale; had practiced law with Fried Frank, the Big Law firm; and had been the dean of the University of California-Los Angeles Law School.

298.     By way of background, I had heard that Yale had helped a student take the bar exam where that student hadn't completed his or her graduation requirements. While I didn't know the procedure for doing this, I assumed the Law School would. Schill granted me a meeting for January 29, 2010.

299.     That day, before I could meet with Schill, Willard and Richardson send him emails about me.  **(Exhibit 27)**

300.     Willard claimed that during my internship, Firm 1 was against giving me a permanent offer of employment due to poor performance. She also stated that, but for the intervention of her, Zarfes, and another administrator, I would not have received an offer. Further, she indicated that she personally became aware of performance issues during my internship and that it continued for years to the time of her writing this email. Despite this, Willard stated that she pressured me to continue my enrollment, including discouraging me from taking a medical leave of absence when I had accrued four incompletes.

301.     Similarly, Richardson recommended against certifying me to take the bar due to my inability to meet academic obligations and noted that my mental health issues prevented me from communicating by email or phone.

302.     While I was waiting in the lobby of Schill's office, Richardson appeared and sexually harassed me. This made me cry, and I asked Schill's executive assistant for help. She then placed me in a different room and closed the blinds. I also asked that Schill not make me take our meeting with Richardson, a request which was denied.

303.     During our meeting, Schill made me sit next to Richardson at a small table, where I was visibly uncomfortable and red-eyed from crying. He advised me that Richardson acted properly in refusing me academic support. He also refused to help me sit for the bar, claiming that I was asking him "to lie" and that helping me "would be wrong" because I had failed to meet my academic obligations. I left this meeting with the understanding that the Law School would not contact NYBOLE and that I would not be able to take the February bar exam.

304.     During the meeting, I discussed my finances, including asking that the Law School pay for my therapy sessions. Having long exhausted my ten free sessions with University SCRS, I had developed a relationship with the therapist I was referred to, who the University made me see and pay for as a condition of my enrollment. However, Schill directed Richardson to contact University SCRS to arrange more sessions with a therapist there, which would have deprived me of my therapist's support.

305.     That same day, Zarfes sent an email about me to Schill, copying Richardson and Willard. **(Exhibit 28)** He wrote,

> I spoke with Professor C, Firm C's hiring partner.
>
> Jane has now turned in to Professor C (several weeks late and after being told it would [not] be accepted) her one-credit paper. Professor C asked if I would read it and assign a grade; she would like to step out of this.

I've litigated employment cases and know enough about the issues to grade a student paper, but I don't want to do this without your approval.

I think this approach is best for the relationship with Firm C and, frankly, **while I'm not a fan of graduating problem students and certifying character and fitness where we have our doubts, I favor this approach in Jane's case.** I've heard reports that she intends to have a dean across the Midway contact Firm 1 to "renegotiate" Jane's start date, etc., and this will not help the Firm 1 relationship. (Regarding Firm C, I believe Professor C genuinely understands this is an anomaly for us. I'll also plan to have lunch with her and several of our students who are headed to Firm C to put a happy face on our relationship.)

**The best for all concerned, in my opinion, is to have Jane graduate as soon as possible.**

(Separately, and not necessary [sic] bearing upon the decision here, **we may want to keep in mind that Jane either has commenced or is planning malpractice litigation against the University Hospitals; I'm not sure we want to add to her potential damages.**) (emphasis added)

306.    With Richardson and Willard's knowledge, Schill allowed Zarfes to accept and grade Paper C. Paper C was then attributed to Class D, an independent research course.

307.    Because Zarfes was a lawyer and authority figure, I thought this was permissive.

308.    Schill, Richardson, Willard, and Zarfes failed to tell me about any of these emails or that Zarfes was concerned about the Hospital's liability.

309.     Subsequently, Schill also changed his mind about contacting NYBOLE about me. Between January 29, 2010 and February 1, 2010, he and Richardson drafted and sent a letter to NYBOLE. The University provided me with their email correspondence containing three drafts of this letter. **(Exhibit 29)**

310.     Because Schill had told me that he would not help me and because I had abandoned my email account due to anxiety, I was totally ignorant of what they were up to.

311.     Subsequently, I went to therapy, where I discussed being sexually harassed by Richardson and resolved to report her. During and between Saturday, February 6, 2010 and Sunday, February 14, 2010, I submitted six complaints of sexual harassment against Richardson to four University employees – Schill, Zarfes, the University dean on call, and the University affirmative action officer ("AAO").

312.     (I do not belong to any minority groups that benefit from affirmative action. Because of the Law School's treatment of me and its totally different attitudes towards my white and Japanese relatives, I preferred to speak with someone outside the Law School who was supposed to help racial minorities.)

313.     As a result of my complaints, the University created additional records, including emails and handwritten notes, two of which I discuss here.

314.     Initially, on Saturday, February 6, I left a voicemail message for Zarfes. On Monday, February 8, Schill, Zarfes, and another employee I refer to as Administrator 2 traded emails about my complaint. In one of them, Administrator 2 wrote, "Hi. Anything like this that involves a student is usually handled by the dean of students, but clearly that won't work in this case. David gave me some details and given the number of people here with whom

she has had unusual contact and the possible case against UCH, I am obtaining directions from central and will write again asap. K." **(Exhibit 30)**

315.     I asked the University who "she" was, what "unusual contact" "she" was alleged to have had, who "she" was alleged to have had "unusual contact" with, what "UCH" was, what "the possible case against UCH" was, and what "central was." I also asked if there were other emails in the chain.

316.     The University said "she" was me but failed to disclose what "unusual contact" I was alleged to have had or with whom. It stated that "UCH" was the University of Chicago Hospitals and that "central" was the University's central administrative functions but refused to say what "the possible case against UCH" was. It said there were other emails in the chain but claimed they were privileged. It refused to disclose any information about the emails, including who Administrator 2 contacted, which was not privileged.

317.     That same day in February 2010, I spoke to Zarfes in person about my sexual harassment complaint against Richardson. He yelled at me and refused to help. Because he was a lawyer, I thought his behavior was legally permissive.

318.     I then resubmitted my complaint to the AAO, after which Richardson was banned from contacting me individually. The AAO create a transcription of a voicemail message that I left her stating that I could not check my own voicemail, which was due to debilitating anxiety. She also created handwritten notes memorializing our conversation, evidencing among other things that I had no idea about a letter being sent to NYBOLE. **(Exhibit 31, page 5)**

319.     Firm 1 allowed me to change my starting date, and in or around February 2010, I entered into another apartment lease.

Spring 2010

320.     I submitted Papers A and B nearly two years after they were originally due. Because
Levmore stepped down as dean before I finished Paper A and because Richardson was
banned from contacting me, Schill arranged for me to submit Paper A to Administrator 1,
who oversaw having the paper graded and grades and credits issued.

321.     On June 8, 2010, the Law School graduated me. Schill signed my diploma, a legal
document.

322.     On June 14, 2010, the Law School certified me to NYBOLE to take the bar,
including submitting my transcript across state lines.

323.     That month, the SOL on my medical malpractice claims expired.

**M. Post-Enrollment (Fall 2010 – Present)**

324.     In September 2010, I moved to New York and began working at Firm 1. One of my
employment requirements was submitting an official transcript to the firm. The University
transmitted my transcript across state lines using mail or wire communications.

325.     That fall, I received my bar exam results. I failed. In November 2010, Firm 1
terminated me for poor performance. I was unable to find another legal job and was left
demoralized, destitute, and unable to support myself. For years, I lived off unemployment
insurance, which New York paid and which was not adequate to pay for basic necessities.
When I worked, it was part-time and generally ended with being fired. I was homeless and
have been sued twice for eviction. I could not afford insurance or adequate healthcare and
took psychiatric medication that damaged my brain.

326.     Because I was ashamed of my circumstances, I grew estranged from those I was
once close to. This included my elderly grandparents, including my grandfather who has

since died, and paternal relatives who cared for me when I was sick, including one who has since died. I have also lost all but one of many friends from high school and college.

327.     These lost years were among those when I was most beautiful and fertile, a shorter window for women than men, exacerbated in my case due to the loss of an ovary. I was and am unable to repay my federal student loans. Given this debt, I cannot afford to have children or to freeze my eggs. In other words, the University has effectively neutered me.

328.     For many years, I blamed myself for my circumstances, characterlogic behavior the University instilled in me.

329.     In late 2016, I became aware that under Title IX, Zarfes violated the law when he yelled at me for claiming sexual harassment against Richardson. I also became aware that the University was required to have investigated my sexual harassment complaints. Curious to read the investigation, I researched how to access it and learned about the Family Educational Rights and Privacy Act ("FERPA"), which allows students to access school records about themselves, including emails.

330.     In November 2016, I submitted FERPA requests for records about my sexual harassment complaint. On December 8, 2016, the University produced the emails between Schill, Zarfes, and Administrator 2 in Exhibit 29. However, I did not know that the University had defrauded me, let alone how.

331.     I submitted additional FERPA requests, including for emails maintained by Levmore, Schill, and Zarfes.

332.     The University produced some of these in March 2017, which took me months to review. Subsequently, I performed legal research and concluded that I did not have a valid law degree due to lack of credits.

333.     At the time of my discovery, I was working part-time at a small law firm, where I was hired based on the assumption that I was a Law School graduate and could take the bar exam. Because I no longer believed this to be the case and because I understood that to practice law or to attempt to practice law with an invalid degree was itself fraud, I left to find a non-legal job.

334.     For months, no one would hire me. In 2018, when I finally received a job offer. it was as a secretary. At the age of 36, my annual salary for this job was $60,000, which was approximately 20% more than I made before law school. Other than working for Firm 1 for two months in 2010, this was the first full-time job I had had since 2006.

335.     In 2019, I was able to find another administrative job, where I was hired at an annual salary of $70,000. Approximately $6,000 of my salary went toward health insurance, effectively reducing my salary to approximately $64,000, which is 28% more than I made before law school.

336.     More recently, after my superior retired, his successor terminated me, then claimed that he already had a secretary. In other words, because I cannot offer unique, valuable skills, such as legal skills, to employers, I not only command a far lower salary but am at greater risk of being replaced.

337.     Based on the University's fraud and my financial circumstances, I repeatedly attempted to secure a lawyer on contingency to sue the University and Hospital, including going back to the lawyer my professor had initially referred me to. However, neither he nor anyone else would represent me without additional written evidence, which the University refused to produce to me.

338.     For years, I attempted to get this evidence through ED. While investigating my FERPA complaint, ED directed me to get a privilege log from the University of emails that it withheld. When the University refused to provide this, ED contacted OLC. Following this, ED dismissed my complaint and claimed that I was not even entitled to the privilege log it told me to get. In addition, ED changed its published FERPA privilege test by removing the requirement that a school needed to ask for legal advice that was not about committing illegal activity. Essentially, ED found that if the University sought legal advice about murdering me, this would be protected under FERPA. This occurred in December 2020, killing all hope that a lawyer might take my case on contingency. Further, this brought back all my feelings of being helpless, unsympathetic, and unbelievable. It was demoralizing.

339.     During our FERPA dispute, I requested that the University provide me with healthcare, including psychiatric care and freezing my eggs so that I might one day be able to have children. Given the University's wealth, it had the resources to extend these services to me. However, it refused to do this.

340.     This was completely different from its treatment of XY, a student who was a member of the Class of 2009. After XY graduated and was practicing law with a firm in New York, a professor encouraged him to apply for judicial clerkships. Based on this, XY eventually accepted a position with a federal judge, which he began in or around October 2010. Within months, the judge terminated him. Because employment was at-will, the termination was lawful. When XY reported this to his professor, the professor blacklisted the judge so that no other Law School student could apply to work for her and arranged for the University to provide support services to XY.

341.     I also asked the University, including Miles – who has a bachelor's degree from Tufts University, a law degree from Harvard University, and a PhD in economics from the University and who has worked at the University for decades –, to revoke my degree for failure to meet minimum credit requirements. The University has refused to do this.

342.     Also while my FERPA dispute was ongoing, in 2018, a jury awarded Hope Cheston, a woman who was raped when she was 14 years-old, $1 billion in damages.

## COUNT I

*Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. §§ 1961–1968*

343.    I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

344.    My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's fraud in mid-2017.

345.    My claims are also timely because the fraud is ongoing.

346.    RICO (18 U.S.C. §§ 1961-1968) includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and bank fraud (the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, "financial institution" is defined at 18 U.S.C. § 20).

347.    Mail fraud has two elements: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts). Schmuck v. United States, 489 U.S. 705, 721 n. 10 (1989); *see also* Pereira v. United States, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under . . . § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.").

348.    The elements of wire fraud under Section 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. United States v. Briscoe, 65 F.3d 576, 583 (7th Cir. 1995).

349.     The mail fraud and wire fraud statutes do not define the terms "scheme" or "artifice" and the courts have traditionally been reluctant to offer definitions of either term except in the broadest and most general terms. United States v. Lemire, 720 F.2d 1327, 1335 (D.C. Cir. 1983) ("Congress did not define 'scheme or artifice to defraud' when it first coined that phrase, nor has it since. Instead that expression has taken on its present meaning from 111 years of case law.").

350.     The fraudulent aspect of the scheme to defraud is to be measured by nontechnical standards and is not restricted by any common-law definition of false pretenses. "[T]he words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wrongdoing one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, chicane, or overreaching.'" Carpenter v. United States, 484 U.S. 19, 27 (1987) quoting McNally v. United States, 483 U.S. 350, 358 (1987) quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924).

351.     "[I]t makes no difference whether the persons the scheme is intended to defraud are gullible or skeptical, dull or bright…." *United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990) (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir.), *cert. denied*, 446 U.S. 919 (1980)). "[T]he monumental credulity of the victim is no shield for the accused . . ." *Id.* (quoting *Deaver v. United States*, 155 F.2d 740, 744-45 (D.C. Cir.), *cert. denied*, 329 U.S. 766 (1946)); *cf. Pollack*, 534 F.2d at 971 (To hold that actual loss to victim is required "would lead to the illogical result that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.") (quoted in *Maxwell*, 920 F.2d at 1036).

352.     To prevail, a plaintiff must prove the existence of a scheme; it is not required, however, to prove all details or all instances of allegedly illicit conduct. *See, e.g.*, United States v. Stull, 743 F.2d 439, 442 n. 2 (6th Cir. 1984) ("It is well established that proof of every allegation is not required in order to convict; the government need only prove that the scheme to defraud existed."), *cert. denied*, 470 U.S. 1062 (1985); United States v. Halbert, 640 F.2d 1000, 1008 (9th Cir. 1981) ("[T]he Government need not prove every misrepresentation charged conjunctively in the indictment."); United States v. Jordan, 626 F.2d 928, 930 (D.C. Cir. 1980) ("The Government is not required to prove the details of a scheme; it is, however, required to prove beyond a reasonable doubt . . . that the defendant . . . willfully and knowingly devised a scheme or artifice to defraud . . . .") (quoting with approval the trial court's instruction on § 1341); United States v. Amrep Corp., 560 F.2d 539, 546 (2d Cir. 1977) ("A scheme to defraud may consist of numerous elements, no particular one of which need be proved if there is sufficient overall proof that the scheme exists."), *cert. denied*, 434 U.S. 1015 (1978); Anderson v. United States, 369 F.2d 11, 15 (8th Cir. 1966) (all instances of illicit conduct need not be proved to sustain a conviction), *cert. denied*, 386 U.S. 976 (1967).

353.     "All that is required is that [the defendant has] knowingly and willingly participated in the scheme; she need not have performed every key act herself." United States v. Maxwell, 920 F.2d 1028 (D.C. Cir. 1990). The "evidence need only show that defendant was a 'knowing and active participant' in scheme to defraud and that scheme involved interstate wire communications." Id. (quoting United States v. Wiehoff, 748 F.2d 1158, 1161 (7th Cir. 1984)).

354.     "The requisite intent under the federal mail and wire fraud statutes may be inferred

from the totality of the circumstances and need not be proven by direct evidence." United

States v. Alston, 609 F.2d 531, 538 (D.C. Cir. 1979), cert. denied, 445 U.S. 918 (1980).

Thus, intent can be inferred from statements and conduct. United States v. Cusino, 694

F.2d 185, 187 (9th Cir. 1982) (citing United States v. Beecroft, 608 F.2d 753, 757 (9th Cir.

1979)), cert. denied, 461 U.S. 932 (1983).

355.     "Fraudulent intent is shown if a representation is made with reckless indifference

to its truth or falsity. Cusino, 694 F.2d at 187. In addition, '[f]raudulent intent may be

inferred from the modus operandi of the scheme.' United States v. Reid, 533 F.2d 1255,

1264 n. 34 (D.C. Cir. 1976) ("[T]he purpose of the scheme 'must be to injure, which

doubtless may be inferred when the scheme has such effect as a necessary result of carrying

it out.") (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180-81 (2d

Cir. 1970) (quoting Horman v. United States, 116 F. 350, 352 (6th Cir.), cert. denied, 187

U.S. 641 (1902))). "Of course proof that someone was actually victimized by the fraud is

good evidence of the schemer's intent." Id. (quoting Regent Office Supply Co., 421 F.2d at

1180-81).

356.     "It is not necessary that the scheme contemplate the use of the mails as an essential

element." Pereira, 347 U.S. at 8; Durland v. United States, 161 U.S. 306, 313 (1896) (proof

of specific intent to use the mails on the part of defendants need not be proven). "It is

sufficient for the mailing to be 'incident to an essential part of the scheme,' . . . or 'a step in

[the] plot' . . . . " Schmuck, 489 U.S. at 710-11 (citations omitted); cf. United States v.

Diggs, 613 F.2d 988, 998 (D.C. Cir.) ("[A]lthough the schemer need not 'contemplate the

use of the mails as an essential element,' the mailings must be sufficiently closely related

to [the] scheme to bring his conduct within the statute.") (footnote omitted), *cert. denied*, 446 U.S. 982 (1980); United States v. Alston, 609 F.2d 531, 538 (D.C. Cir. 1979) ("For conviction under the mail fraud statute, the mails must be used 'for the purpose of executing' the fraudulent scheme, and not merely 'as a result of' such scheme.") (quoting Kann v. United States, 323 U.S. 88 (1944)), *cert. denied*, 445 U.S. 918 (1980).

357.    "As in the case of mail fraud, a wire transmission may be considered to be for the purpose of furthering a scheme to defraud if the transmission is incident to the accomplishment of an essential part of the scheme. United States v. Mann, 884 F.2d 532, 536 (10th Cir. 1984). Moreover, it is not necessary to show that the defendant directly participated in the transmission, where it is established that the defendant caused the transmission, and that such use was the foreseeable result of his acts." United States v. Gill, 909 F.2d 274, 277-78 (7th Cir. 1990); United States v. Jones, 554 F.2d 251, 253 (5th Cir.), *cert. denied*, 434 U.S. 866 (1977) (cases cited); United States v. Wise, 553 F.2d 1173 (8th Cir. 1977).

358.    "The gist of the offenses is not the scheme to defraud, but the use of the mails or interstate wire communication." *See* United States v. Garland, 337 F. Supp. 1, 3 (N.D. Ill. 1971); *see also* United States v. Gardner, 65 F.3d 82, 85 (8th Cir. 1995) ("The use of the post office establishment in the execution of the alleged scheme to obtain money by false pretenses is the gist of the offense which the statute denounces, and not the scheme to defraud.") (*quoting* Cochran v. United States, 41 F.2d 193, 197 (8th Cir. 1930)), *cert. denied*, 116 S.Ct. 748 and 116 S.Ct. 1044 (1996); United States v. Lebovitz, 669 F.2d 894, 898 (3d Cir.) ("The gist of the offense of mail fraud is the use of mails by someone to carry out some essential element of the fraudulent scheme or artifice."), *cert. denied*, 456 U.S.

929 (1982). Accordingly, each use of the mails (in the case of mail fraud) and each separate wire communication (in the case of wire fraud) constitutes a separate offense, i.e., each mailing and/or wire transmission can constitute a separate count in the indictment. *See, e.g.*, United States v. Pazos, 24 F.3d 660, 665 (5th Cir. 1994) (mail fraud); United States v. Rogers, 960 F.2d 1501, 1514 (10th Cir.) (each use of mails is separate offense), *cert. denied*, 506 U.S. 1035 (1992); United States v. Castillo, 829 F.2d 1194, 1199 (1st Cir. 1987) (wire fraud).

359.	Under RICO, plaintiffs are entitled to actual damages, punitive damages consisting of treble actual damages, and reasonable attorney's fees and costs. 18 U.S.C. § 1964

360.	The University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes are participants in a scheme to deprive me of medical malpractice damages, federal student loans, and tuition and fees. This scheme included concealing my economic harms during the SOL on medical malpractice claims by manufacturing a false academic and professional record as well as covering up this concealment, which is ongoing to this day.

361.	As previously detailed in the statement of facts, to conceal my economic damages, the University and its employees manipulated the outcome of my summer internship to secure an offer for a job I could not do. For example, Richardson made me to return to my internship post-surgery as a condition of my paper extension; Willard made me stay at my internship when I wanted to leave; and she and Zarfes communicated with my employer without my prior knowledge or consent to secure an offer for a job I could not do, then pressured me to accept it.

362.	The University also issued grades, credits, transcripts, and a law degree in violation of its own academic policies. For example, when I failed to submit Paper A on time

(whether by the original deadline, a later deadline based on time lost due to illness, one year, or other standard), I should have received a failing grade and zero academic credits. Instead, Levmore, Richardson, and Zarfes and later Schill agreed to accept Paper A or arranged for someone else to do so. Since Paper B was subject to the same extension cap as Paper A and since Richardson and Zarfes were involved in arranging both extensions, they should have ensured that I received a failing grade and zero academic credits for Paper B. However, they did not. When I failed to submit Paper C on time and Professor C refused to accept it, I should have again received a failing grade and zero academic credits for Class C. Instead, with the permission or knowledge of Richardson, Schill, Willard, and Zarfes, I was given two academic credits and a non-failing grade for Class C, and Paper C was attributed to Class D, which I never took but for which I received one writing and one academic credit anyway.

363.     The University also continued my enrollment when I lacked good standing and was unable to do satisfactory work such that doing so inculcated false hopes, was financially exploitive, and harmed the education of other students. I was not in good standing when I failed to submit Papers A, B, and C on time (whether by the original deadline, a later deadline based on time lost due to illness, one year, or other standard), thus giving rise to at least two failing grades in my third academic year, which spanned Years 3 and 4, or three failing grades during my enrollment. Similarly, when Firm 1 was against giving me an offer of employment because I failed to submit assignments on time or at all during my internship, it became clear that continuing my enrollment would create false hopes or be financially exploitive. This was reinforced when I returned to the Law School and failed to meet academic requirements for all of my classes while taking a reduced course load.

Similarly, when I failed to submit Paper C on time, this damaged the University's relationship with Firm C, whose lawyers taught at, recruited from, and were major donors to the Law School, and thus harmed the education of other students. At different times, Levmore, Richardson, Schill, Willard, and Zarfes, who had a duty to monitor my progress, knew or should have known that I was not in good standing or was unable to do satisfactory work. However, none of them pursued the termination of my enrollment.

364.     In addition, this scheme included covering up the concealment of my economic harms, which is ongoing to this day. For example, during my enrollment, Levmore, Richardson, Schill, Willard, and Zarfes failed to tell me that they, their colleagues, or the University was legally adverse to me due to my medical malpractice claims. After the SOL on my medical malpractice claims had passed, the University sent my fraudulent transcript to NYBOLE and Firm 1. The University continues to hold me out as a graduate, including Miles failing to revoke my degree. Further, the University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes have failed to confess to the fraud as the University did in Mink v. Univ. of Chicago, 460 F.Supp. 713 (ND Ill. 1978) when it sent letters to women stating that it had conducted medical experiments on them without their knowledge or consent nearly 30 years before.

365.     Defendants engaged in mail and wire communications in furtherance of this fraud. These acts of mail and wire fraud include the following email, phone, or mail communications between New York and Illinois:

1.  Zarfes sending emails disclosing my medical crisis in violation of my confidence;

2.  Zarfes and Richardson sending emails conspiring to conceal the extent of his disclosure;

3.  Richardson emailing me to fraudulently induce me to contact her office even though she already had sufficient information to arrange my paper extension;

4.  during this call, Richardson failing to identify herself as a lawyer representing the University or Hospital's legal interests regarding my medical malpractice claims, withholding a paper extension unless I disclosed information subject to doctor-patient privilege and returned to my internship post-surgery, and lying to me about what my diagnosing doctor said;

5.  Willard speaking with me on the phone while I was interning with Firm 1 without identifying herself as an agent representing the University or Hospital's legal interests regarding my medical malpractice claims and making me work against my will and my doctor's orders;

6.  the Law School, including Willard and Zarfes, communicating with Firm 1 by phone or email without my prior knowledge or consent to secure an offer for a job I could not do and sought to leave;

7.  Schill and Richardson communicating with NYBOLE about my taking the bar exam when I was not eligible to be enrolled or to graduate; and

8.  the Law School emailing or faxing NYBOLE and Firm 1 copies of my fraudulent transcript or otherwise holding me out to be a Law School graduate.

366.    This fraud affected financial institutions. Again, to return to my internship, I had to return the money Firm 1 had already paid me and re-earn it. Subsequently, in Fall 2008, Spring 2009, and Fall 2009, the University processed and distributed my federal student loans, including paying itself and the Hospital my tuition and fees. In addition, Firm 1 paid me a deferral stipend, health insurance reimbursement, bar stipend, and salary and benefits.

367.     Defendants had the requisite fraudulent intent. Defendants expressed concern for the Hospital's medical malpractice liability; withheld, omitted, or concealed such expressions of concern from me; changed their behavior or violated academic policy based on this concern; or refuse to revoke my degree.

368.     Representations were made with reckless indifference to their truth or falsity. For example, Richardson emailed me that she wanted to help me even though she was legally adverse to me. In addition, the Law School sent my transcript containing a fictive class and false grades and credits to NYBOLE and Firm 1.

369.     Proof that someone was actually victimized by the fraud is good evidence of the schemer's intent. I was victimized by the University's fraud, including being deprived of medical malpractice damages, federal student loans, and tuition and fees. I also paid for and was issued an invalid law degree that is not usable for the practice of law.

370.     All Defendants are jointly and severally liable.

371.     To begin with, the University and Hospital are alter egos of each other.

372.     Under Illinois law, the alter ego doctrine is an equitable doctrine. Main Bank v. Baker, 86 Ill.2d 188, 206 (Ill. 1981) (discussing "the equitable doctrine of piercing the corporate veil").

373.     Equitable doctrines are broadly construed and are not entirely dependent on precedent. See Fienhold v. Babcock, 275 Ill. 282, 289 (Ill. 1916) ("…[E]quity does not depend, alone, on precedent. (internal citation omitted) As was said in the case cited, a court of equity will not suffer a right to exist without a remedy.")

374.     "…[A] corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be

affiliated." Main Bank, 86 Ill.2d at 204. However, in certain circumstances, it is possible to set aside corporate distinctions and pierce the corporate veil, holding a parent liable for a subsidiary or a subsidiary liable for a parent. Id. at 205.

375.　　"Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." Id. at 204.

376.　　"In determining whether the requisite degree of control is maintained by one corporation over the affairs of another to justify disregarding their separate corporate identities, the Illinois courts have considered some of the following: (1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." Van Dorn Co. v. Future Chemical and Oil Corp., 753 F. 2d 565, 570 (7th Cir. 1985) citing Main Bank, 86 Ill.2d at 205-6. This list is not exhaustive of all factors that a court may consider.

377.　　Stock ownership alone or the use of common officers and directors alone does not establish an alter ego relationship. See Id. at 204.

378.　　The University dominates the Hospital such that the Hospital is a mere instrumentality of the University.

379.　　Originally, the Hospital was part of the University. See Mink, 460 F.Supp. 713 (a case in which the University was sued by medical patients for conducting experiments on them without their knowledge or consent).

380.     Although the Hospital was separately incorporated in 1986, it continued to operate as part of the University.

381.     According to the Hospital's Form 990,

1.   the Hospital's sole member is the University;

2.   it operates on the University campus;

3.   its medical staff are University employees. Again, to the best of my knowledge, the Hospital does not hire its own doctors. Instead, it pays the University hundreds of millions of dollars a year to use doctors employed by the University, making the University the Hospital's highest paid independent contractor. Essentially, the University and Hospital share the same employees and split the cost of employing them;

4.   based on the Hospital's bylaws, its board of trustees automatically include the University's president, the University's provost, and the chair of the University's board;

5.   the University's board elects the Hospital's trustees, appoints trustees to fill vacancies, and appoints some members of certain committees, including the executive committee;

6.   the University president appoints the Hospital's CEO;

7.   the University board approves the Hospital's president;

8.   the University has the power to amend the Hospital's bylaws; and

9.   only the University and no other entity has control over the Hospital.

382.     The University and Hospital also have a joint brand called UChicago Medicine. According to UChicago Medicine's conflicts of interest policy, the University and Hospital

share funds, property, and resources. Further, the UChicago Medicine is overseen by the UChicago Medicine EVP, a University employee.

383.     Adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. The Hospital would continue to evade liability for medical malpractice. Further, neither the University alone nor the Hospital alone have enough money to compensate me for my damages, and I need to be able to hold both liable.

384.     "In Illinois, employers may be liable for the actions of their employees if they are within the scope of employment, *i.e.,* if those actions are the kind the employee was hired to perform, the actions occur substantially within the authorized time and space limits, and they are actuated, at least in part, by a purpose to serve the master." <u>Chou v. Univ. of Chicago</u>, 254 F.3d 1347, 1361 quoting <u>Pyne v. Witmer</u>, 543 N.E.2d 1304, 1308 (1989).

385.     University employees were agents of the University in implementing academic policies and in communicating with students and third parties. This included arranging paper extensions and other reasonable accommodations for students with disabilities; under Standard 303, monitoring a student's performance, terminating her enrollment where she lacked good standing or the ability to do satisfactory work, and issuing grades, credits, transcripts, and degrees according to academic policies; and providing accurate transcripts and graduation information to students, employers, and entities administering the bar.

386.     The University, a nationally and internationally renowned institution, operated across the country and around the world. The University hired salaried employees who worked during and outside of normal business hours. Employees used University-provided equipment and resources, such as computers, phones, email accounts, and phone numbers, to communicate internally and externally.

387.     Employees sought to serve the University, including its subsidiary and alter ego the Hospital, by conferring financial and reputational advantages on the University and Hospital, including depriving me of medical malpractice damages, federal student loans, and tuition and fees and minimizing the severity of their failure to provide healthcare.

## COUNT II

*Illinois Consumer Fraud and Deceptive Business Practices Act – 815 ILCS 505*

388.　　I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

389.　　My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's fraud in mid-2017.

390.　　My claims are also timely because the fraud is ongoing.

391.　　The Illinois Consumer Fraud and Business Practices Act ("Consumer Fraud Act") "protects consumers against "unfair or deceptive acts or practices," including "fraud," "false promise," and the "misrepresentation or the concealment, suppression or omission of any material fact." 815 ILCS 505/2." Wigod v. Wells Fargo Bank, NA, 673 F. 3d 547, 574 (7th Cir. 2012).

392.　　To state a claim under the Consumer Fraud Act, a plaintiff must claim (1) a deceptive or unfair act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice, (3) the unfair or deceptive practice occurred in the course of conduct involving trade or commerce, and (4) the defendant's conduct is the proximate cause of the plaintiff's injury." Id. See Siegel v. Shell Oil Co., 612 F.3d 932, 934 (7th Cir.2010); Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002).

81

393.     Under the Consumer Fraud Act, plaintiffs are entitled to actual damages, including

reasonable attorney's fees, and punitive damages consisting of treble actual damages. 815

ILCS 505/2W.

394.     The University and its employees engaged in many deceptive acts and practices.

395.     The Law School was a fiduciary to its students and made claims consistent with

this duty. In the Faculty Handbook and on YouTube, the University claimed employees

were part of a broad system of support for students and that students came first. In June

2008, after learning of my ovarian tumor, Richardson, copying Zarfes, emailed me

claiming to desire to assist me in whatever way possible. Similarly, Zarfes claimed to me

and my professor that he sought to help me professionally, such as securing a job offer with

Firm 1.

396.     The Law School advertised that it was accredited by the ABA. As a condition of

accreditation, the Law School was required to follow ABA Standards. Standard 303

required that law schools adhere to their own academic standards in issuing grades, credits,

transcripts, and law degrees and that they terminate the enrollment of a student where she

lacked good standing or the ability to do satisfactory work. The University was wholly

responsible for enforcing its own academic policies, some of which were not even available

to students, such as that the recommended length of a paper extension was the time lost

due to illness.

397.     However, these statements constituted fraud, false promises, misrepresentations, or

the concealment, suppression, or omission of material fact.

398.     In fact, the University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes are

legally adverse to me due to my medical malpractice claims against the Hospital, sought to

conceal my economic damages during the SOL on such claims, or to cover up this concealment, which is ongoing to this day. In addition, the University, Levmore, Richardson, Schill, Willard, and Zarfes violated the University's own academic standards in issuing grades, credits, transcripts, and my degree and in continuing my enrollment when I lacked good standing or the ability to do satisfactory work.

399.    The University and its employees intended that I rely on these deceptions in enrolling there, including borrowing federal student loans and paying the University and Hospital tuition and fees, and in seeking advice from them.

400.    The deceptions occurred in the course of conduct involving trade and commerce, including in its admissions materials, handbooks, and webpages accessible around the world, as well as in email, phone, and in-person communications with me.

401.    The deceptive acts and practices were the proximate cause of my injuries. As a result of the deception, I was defrauded of medical malpractice damages, federal student loans, and tuition and fees. In addition, I have a law degree that is not useable for the practice of law.

402.    All Defendants are jointly and severally liable. For the reasons stated previously, the University and Hospital are alter egos of each other, and adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. For the reasons stated previously, the University and Hospital are liable for the individual Defendants because their actions occurred within the scope of their employment.

## COUNT III

*Common Law Breach of Fiduciary Duty*

403.     I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

404.     My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's fraud in mid-2017.

405.     My claims are also timely because the fraud is ongoing.

406.     Under Illinois law, breach of fiduciary duty is a type of fraud. Halperin v. Halperin, 750 F.3d 668, 672 (7th Cir. 2014) ("A fiduciary has a duty to inform his beneficiary of facts material to the fiduciary relationship, such as, in the case of a trustee, the amount of money held in the trust. A failure to comply with the duty to inform that prevents the beneficiary from learning something the fiduciary is duty-bound to communicate to him (such as that the fiduciary is stealing from him!) is concealment, and is fraudulent because it is taking advantage of the beneficiary's dependence on the fiduciary."); Majewski v. Gallina, 160 N.E.2d 783, 790 (Ill. 1959) ("It is incumbent upon us, therefore, to adjudge whether the transaction, whereby this 'advantage' was procured, could be deemed fraudulent. In so doing we recognize that where the existence of a fiduciary relationship is established, as in the instant case, courts will scrutinize such transactions with greater severity, and the duty is upon the beneficiaries to vindicate the bargain from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect. (internal citations omitted) Moreover, it is of no consequence whether the conveyance was to the

fiduciary or to another. The principle is set forth in Lord Eldon's statement, quoted in the Addis case, 358 Ill. at page 134, 192 N.E. at page 777, 'Let the hand receiving it be ever so chaste, yet if it comes through a corrupt, * * * channel the obligation of restitution will follow it.'"); In re Estate of Rothenberg, 530 N.E.2d 1148, 1150 (Ill. App. 1st Dist. 1988) ("Once a fiduciary relationship has been shown, the law presumes that any transaction between the parties by which the fiduciary has profited is fraudulent. The burden then shifts to the fiduciary to prove by clear and convincing evidence that the transaction was not the result of undue influence. If the burden cannot be met, the transaction will be set aside.")

407.    To state a claim for breach of fiduciary duty, a plaintiff must allege (1) that a fiduciary relationship or duty exists, (2) that this duty was breached, and (3) that this breach was the proximate cause of the plaintiff's injuries. Neade v. Portes, 739 N.E.2d 496, 502 (Ill. 2000). See Ball v. Kotter, 723 F.3d 813, 826 (7th Cir. 2013).

408.    A fiduciary duty may arise in two ways. First, it may arise as a matter of law, such as between a principal and agent, a client and lawyer, a patient and a doctor, or a minor ward and guardian. See Chou v. Univ. of Chicago, 254 F.3d 1347, 1362 (Fed. Cir. 2001); Ball, 723 F.3d at 826; Neade, 739 N.E.2d at 500.

409.    Second, it "may also arise from the special circumstances of the parties' relationship, such as when one party justifiably places trust in another so that the latter gains superiority and influence over the former." Chou, 254 F.3d at 1362. See Khan v. Deutsche Bank, 978 N.E.2d 1020, 1040 (Ill. 2012) ("A fiduciary relationship exists where one party reposes trust and confidence in another, who thereby gains a resulting influence and a superiority over the subservient party.")

410.    For example, "...[i]f a person solicits another to trust him in matters in which he

represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him, a fiduciary relation is established." Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992). *See* Al Maha Trading & Contracting v. W.S. Darley & Co., 936 F.Supp.2d 933, 946 (N.D. Ill. 2013) ("…[U]nder Illinois law, 'a fiduciary duty can arise if the dominant party agrees to exercise its judgment on behalf of the servient party.'"); Ransom v. AB Dick Co., 682 N.E.2d 314, 322 (Ill. App. Ct. 1997) ("Moreover, a fiduciary duty can arise if the dominant party agrees to exercise its judgment on behalf of the servient party.").

411.     "The relationship need not be legal but it may be either moral, social, domestic, or merely personal." Fisher v. Burgiel, 46 N.E.2d 380, 385 (Ill. 1943); Ball, 723 F.3d at 826 ("As to the first element, it is widely understood that a fiduciary relationship 'may arise as a matter of law, such as between an agent and principal, or it may be moral, social, domestic, or personal.'").

412.     In determining whether a fiduciary relationship exists, courts consider several factors. These factors include "the disparity in age, health, mental condition, education and business experience, and the degree of trust placed in the dominant party." Kurtz v. Solomon, 656 N.E.2d 184, 191 (Ill. App. Ct. 1995). *See* Chou, 254 F.3d at 1362 ("The relevant factors in determining whether the latter fiduciary relationship exists include the disparity in age, education, and business experience between the parties, and the extent to which the 'servient' party entrusted the handling of its affairs to the 'dominant' party and placed its trust and confidence in that party."); McCartney v. McCartney, 134 N.E.2d 789. 792 (Ill. 1956) ("Factors to be considered, however, include the degree of kinship, as well as disparity in age and business experience, and the extent to which the allegedly servient

party entrusts the handling of his affairs to the other.").

413.       They factors also include the existence of friendship or agency. <u>Steinmetz v. Kern</u>, 32 N.E.2d 151, 154 (Ill. 1941 ) ("Particularly, as in this case, where by reason of friendship, agency, business association and experience, a high degree of trust is reposed, a confidential relationship may be said to exist.")

414.       In addition, these factors include the beneficiary's status as an orphan. *See* <u>Tate v. Williamson</u>, L. R. 2 Ch. 55 (1866), an English case cited four times by the Illinois Supreme Court in <u>Crossman v. Keister</u>, 223 Ill. 69 (Ill. 1906); <u>Mayrand v. Mayrand</u>, 194 Ill. 45 (Ill. 1901); <u>Marshall v. Coleman</u>, 187 Ill. 556 (Ill. 1900); <u>Roby v. Colehour</u>, 25 N.E. 777 (Ill. 1890).

415.       "…[A] fiduciary relationship is founded on the substantive principles of agency, contract and equity." <u>Armstrong v. Guigler</u>, 673 N.E.2d 290, 294 (Ill. 1996). *See* <u>Havoco of America, Ltd. v. Sumitomo Corp. of America</u>, 971 F. 2d 1332, 1336 (7th Cir.1992) ("The Illinois Supreme Court held that the Tort Immunity Act did not bar the plaintiff's suit because actions for breach of fiduciary duty are 'controlled by the substantive laws of agency, contract and equity.' The court rejected the *Restatement (Second) of Torts'* view that breach of fiduciary duty is a tort.").

416.       "It is an elementary maxim of equity jurisprudence that there is no wrong without a remedy." <u>Leo Feist v. Young</u>, 138 F.2d 972, 974 (7th Cir. 1943). *See* <u>Fienhold</u>, 275 Ill. at 289 ("…[E]quity does not depend, alone, on precedent. [internal citation omitted] As was said in the case cited, a court of equity will not suffer a right to exist without a remedy."); John Pomeroy, <u>A treatise on equity jurisprudence, as administered in the United States of America: adapted for all the states, and to the union of legal and equitable</u>

remedies under the reformed procedure, Volume 1, Edition 2, p. 578 (1892) ("Equity will not suffer a wrong to be without a remedy.").

417.     Further, "equity does not depend, alone, on precedent." Fienhold, 275 Ill. at 289.

418.     Because breach of fiduciary duty arises at equity, it is broadly construed to ensure that new instances of fiduciary relationships are included no matter how they may arise. *See* Sawyer v. Creighton, 403 Ill. 364, 370 (Ill. 1949) ("…[T]he term 'fiduciary relationship' is a very broad one and such relationship exists in all cases in which influence has been acquired and abused or in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one trusts in and relies upon another."); Fisher, 382 Ill. At 52 ( "It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring."); Kosakowski v. Bagdon, 369 Ill. 252, 254 (Ill. 1938) ("Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such manner that other and perhaps new cases might be excluded."); Roby, 25 N.E. at 778 citing Tate, L. R. 2 Ch. 55 ("The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise.")

419.     Where a fiduciary relationship exists, the fiduciary is required to "treat his principal with the utmost candor, rectitude, care, loyalty, and good faith – in fact to treat the principal

as well as the agent would treat himself." <u>Burdett</u>, 957 F.2d at 1381. *See* <u>Ball</u>, 723 F.3d at

826 ("…Kotter had a duty to treat Hedstrom with 'the utmost candor, rectitude, care,

loyalty, and good faith.'"); <u>Miller v. Harris</u>, 985 N.E.2d 671, 679 (Ill. App. Ct. 2013) ("A

fiduciary relationship carries with it 'the duty of * * * candor, rectitude, care, loyalty, and

good faith.'").

420.     The existence of the fiduciary relationship prohibits the fiduciary from acquiring

interests that are adverse to those of the beneficiary or from dealing independently of the

beneficiary's interests for personal gain. <u>Neade</u> at 500 ("A fiduciary relationship imposes

a general duty on the fiduciary to refrain from 'seeking a selfish benefit during the

relationship.'"); <u>Chou</u>, 254 F.3d at 1362 ("The existence of a fiduciary relationship

prohibits the dominant party with the duty from seeking or obtaining any selfish benefit for

himself at the expense of the servient party while the fiduciary duty exists.").

421.     The fiduciary is required to disclose his knowledge of all matters relating to the

agency to the beneficiary. <u>Miller</u>, 985 N.E.2d at 679 ("An agent, thus, must keep the

principal informed on all matters of which he has knowledge that pertain to the subject

matter of the agency. The agent breaches this duty not only when he acts adversely to the

principal's interest, but also when he conceals facts that involve the principal's

advantage.'").

422.     Concealment of information that is advantageous to the beneficiary is a breach of

fiduciary duty and constitutes fraud. <u>Id</u>. *See* <u>Halperin</u>, 750 F.3d at 672 ("A fiduciary has a

duty to inform his beneficiary of facts material to the fiduciary relationship, such as, in the

case of a trustee, the amount of money held in the trust. A failure to comply with the duty

to inform that prevents the beneficiary from learning something the fiduciary is duty-bound

to communicate to him (such as that the fiduciary is stealing from him!) is concealment, and is fraudulent because it is taking advantage of the beneficiary's dependence on the fiduciary."). In other words, it is not only a breach of fiduciary duty to steal from the beneficiary but also to fail to inform the beneficiary of the theft.

423.     The duty to disclose is so broad that it applies whether the victim of the harm is the beneficiary of the fiduciary relationship or a third-party. *See* Mink, 460 F.Supp. 713 (a case where the University disclosed its breach of fiduciary duty to the beneficiaries of that duty where the victims were the beneficiary's children, who were fetuses at the time of the breach and therefore not party to the fiduciary relationship.).

424.     Moreover, transactions between a fiduciary and a beneficiary in which a fiduciary benefits are presumed to be fraudulent. Rothenberg, 530 N.E.2d at 1150 ("Once a fiduciary relationship has been shown, the law presumes that any transaction between the parties by which the fiduciary has profited is fraudulent. The burden then shifts to the fiduciary to prove by clear and convincing evidence that the transaction was not the result of undue influence. If the burden cannot be met, the transaction will be set aside."). *See* Majewski, 160 N.E.2d at 790 ("It is incumbent upon us, therefore, to adjudge whether the transaction, whereby this 'advantage' was procured, could be deemed fraudulent. In so doing we recognize that where the existence of a fiduciary relationship is established, as in the instant case, courts will scrutinize such transactions with greater severity, and the duty is upon the beneficiaries to vindicate the bargain from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect. (internal citations omitted) Moreover, it is of no consequence whether the conveyance was to the fiduciary or to another. The principle is set forth in Lord Eldon's statement, quoted in the Addis case, 358 Ill. at page

134, 192 N.E. at page 777, 'Let the hand receiving it be ever so chaste, yet if it comes through a corrupt, * * * channel the obligation of restitution will follow it.'").

425.       In the event of transactions between a fiduciary and a beneficiary, a fiduciary must "vindicate the bargain from any shadow of suspicion" (Id.), show the transaction "was perfectly fair and reasonable in every respect" (Id.), and that it "was not the result of undue influence." Rothenberg, 530 N.E.2d at 1150. "If the burden cannot be met, the transaction will be set aside." Id. See Majewski, 160 N.E.2d at 790 ("Let the hand receiving it be ever so chaste, yet if it comes through a corrupt, * * * channel the obligation of restitution will follow it.").

426.       Fiduciary duties attach indefinitely. See Mink, 460 F.Supp. 713 (a case where the University disclosed its breach of fiduciary duty nearly 30 years after it occurred).

427.       Fiduciary duties are not waivable. Khan v. Deutsche Bank, 978 N.E.2d at 1038-42 (a case where the Illinois Supreme Court found that the plaintiff, a sophisticated billionaire businessman, did not waive his status as the beneficiary of a fiduciary relationship where he signed a contract stating that the bank was not his fiduciary).

428.       That the university-student relationship is a fiduciary one has been a matter of law and scholarship for decades. For example, in 1966, Alvin Goldman, a law professor, wrote,

…All the elements of a fiduciary relation are present in the student-university relationship. It is no small trust – no small display of confidence to place oneself under the educational mentorship of a particular university. The value of an educational experience is directly affected by the school's conscientious, faithful performance of its duties – duties which are directed toward the student's benefit. The educator has the responsibility of setting

91

out tasks, the performance of which will presumably benefit the student. The student performs these tasks in reliance upon the educator's good faith performance of his duties as a teacher. In addition to often making confidential disclosures about his background, his health and his financial situation in applications for admission and assistance, the student is expected to confide in course and career counselors who are appointed by the university. More important, in the examination process, a university typically commands the student to disclose opinions on art, religion, history, philosophy, political theory and the like, in order to discover the extent of his learning, ability and potential. In making these disclosures, the student reposes confidence in the school's skill and objectivity in evaluating, scoring and reporting these manifestations of learning, ability and potential. The university undertakes to select those who are competent to teach and to establish for its students' benefit an atmosphere conducive to intellectual development and to present a program of studies and activities designed to expand and develop its students' mental horizons. This is so whether a university is oriented toward the liberal arts or toward awarding professional degrees. These are the qualities they stress in their catalogues and at their orientation lectures and alumni dinners.

It is evident, therefore, that the student, of necessity, reposes great confidence in the fidelity to duty and in the integrity of his teachers and school administrators and that this confidence is an absolute necessity for the effective operation of institutions of higher learning. This reposing of

confidence is that which is placed in a fiduciary. It is very similar to that reposed in a doctor, a lawyer, a clergymen or a corporate director.

In varying degrees, of course, some students do not place any trust or confidence in their university. In some cases the student regards his stay at an educational institution as a fruitless initiative rite arbitrarily imposed by his culture or family. In other cases the student is attending a school other than the one of his preference and recognizes, or imagines, the presence of various limitations in its staff's ability to give him the education he desires. Even in such cases, however, the university is in a sufficient position of dominance to give it all of the earmarks of a fiduciary. It prescribes course work and programs and holds the power of advancing the student, of disciplining him and of issuing the desired degrees. Such dominance is similar to that which gives rise to a fiduciary relation between the promoter and corporate shareholder, director and shareholder, administrator and distribute, and trustee and beneficiary.

Whether because of the confidence which a student reposes in the university or because of the dominance of the university over the student and his destiny, the relationship between student and university is a fiduciary relationship. As Professor Warren Seavy has observed: "A fiduciary is one whose function it is to act for the benefit of another as to matters relevant to the relation between them. Since schools exist primarily for the education of their students, it is obvious that professors and administrators act in the

fiduciary capacity with reference to the students." *The University and the Liberty of Its Students--A Fiduciary Theory*, 54 Ky. L.J. 643, 671-73 (1966).

429.     From the Ninth Circuit to the New Hampshire Supreme Court, courts across this country have agreed, finding universities and their employees to be fiduciaries to students. Jumbo v. Ala. State Univ., 229 F.Supp.3d 1266 (M.D. Ala.2017); Orzechowitz v. Nova Southeastern Univ., 2014 WL 1329890 (S.D. Fl. 2014); Johnson v. Walden Univ., Inc., 839 F.Supp.2d 518 (D. Conn. 2011); Colli v. Southern Methodist Univ., 2010 WL 7206216 (N.D. Tex., 2011); Cox v. Univ. of Ark., 2006 WL 1185380[1] (E.D. Ark. 2006); Bird v. Lewis & Clark Coll., 303 F.3d 1015 (9th Cir. 2002); Chou, 254 F.3d 1347; Johnson v. Schmitz, 119 F.Supp.2d 90 (D. Conn. 2000); Schneider v. Plymouth State Coll., 744 A.2d 101 (N.H. 1999); Burdett, 957 F.2d 1375; Mink, 460 F.Supp. 713.

430.     The Schneider court, one of the first to recognize the university-student relationship as a fiduciary one, echoed the language of Professor Goldman's article, holding, "The relationship between students and those that teach them is built on a professional relationship of trust and deference, rarely seen outside the academic community." Schneider, 744 A.2d 101 at 105-6.

431.     Courts have recognized the university-student relationship as a fiduciary one in at least three lawsuits in Illinois, including two lawsuits against the University and one involving a professor with Northwestern.

432.     In Mink, an Illinois court found the University was a fiduciary to Patsy Mink, a Law School student, and other women. The court found this duty to exist where, during and between 1950 and 1952, the University tested drugs on thousands of pregnant women without their knowledge or consent, causing genital cancer in their children, who were

fetuses at the time and therefore not a party to the fiduciary relationship. The plaintiffs became aware of this when nearly 30 years later the University sent them letters disclosing its wrongdoing. The court noted that the nature of a fiduciary relationship "tended to preclude the beneficiary from discovering his fiduciary's misfeasance" due to the servient party's trust of and inability to monitor the dominant party. <u>Mink</u>, 460 F.Supp. at 721.

433.        In <u>Chou</u>, a federal court found that the University was a fiduciary to Joany Chou, a graduate student and researcher, where Bernard Roizman, a professor at the University, stole Chou's research, patented her findings in his sole name, and defrauded her of royalty money. The court found Roizman was a fiduciary to Chou because he "held a position of superiority over her as her department chairman," "he had specifically represented to her that he would protect and give her proper credit for her research and inventions," there was vast "disparity of their experience and roles," and he held "responsibility to make patenting decisions regarding Chou's inventions." <u>Chou</u>, 254 F.3d at 1362. Further, Chou and Roizman had a personal relationship, including a longstanding friendship and mentor-mentee relationship. Brief of Plaintiff-Appellant at 36, 39, 40, and 42, <u>Chou v. Univ. of Chicago</u>, No. 99 C 4495 (Fed. Cir. 2000).

434.        In <u>Burdett</u>, the Seventh Circuit found a fiduciary duty to exist between a Northwestern University professor and his student. The court noted that the professor and student became friends, she sought his help and expertise, and they had an ongoing personal relationship where they took meals together and discussed personal and professional matters. <u>Burdett</u>, 957 F.2d at 1378-9 ("Miller is a certified public accountant, a professor of accounting at Northwestern University, and the owner of his own accounting firm. Burdett and Miller met and became friends in 1979 when Burdett enrolled in a course

that Miller taught. She hired him to prepare her income tax returns. They would have lunch occasionally and discuss both business and personal matters.").

435.     Under Illinois law, plaintiffs in fraud cases are entitled to actual and punitive damages, and there is no cap on punitive damages. K2 Development v. Braunstein, 2013 Ill. App. 103672 at 18 (Ill. App. Ct. 2013) ("There is no 'bright-line ratio which a punitive damages award cannot exceed,' but rarely will an award greater than a single-digit ratio between punitive and compensatory damages satisfy due process, with an award greater than four times the amount of compensatory damages being 'close to the line.'").

436.     The University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes were and are my fiduciaries as a matter of law and based on the circumstances.

437.     Again, universities and their employees in Illinois, including the University, have been found to be fiduciaries to their students in multiple lawsuits. As a result, in Illinois, the university-student relationship has essentially become a fiduciary relationship at law.

438.     In addition, they were my fiduciaries based on the circumstances. This included disparities in age, health, mental condition, education, and business experience. This also included the degree of trust I placed in them, their dominance over me, our friendship and agency relationships, and my status as an orphan.

439.     When I enrolled, I was in my 20s. Defendants were far older and more experienced. I was already in mental and physical decline due to a catastrophic tumor on my endocrine system, a decline which would worsen throughout my enrollment. Defendants were successful and gainfully employed. Where I only had a college degree, Defendants had at least one advanced degree, with Levmore, Willard, and Zarfes having multiple advanced degrees. (Since my law degree is fraudulent, I still only have a college degree.) I grew up

on a farm, which constituted the bulk of my work experience, before briefly teaching at a school and then working in an administrative capacity at an accounting firm for a few years. Defendants had decades of professional experience and legal practice, including Zarfes being the general counsel for a multi-national company.

440.     I borrowed hundreds of thousands of dollars to attend the University, which I depended on to educate me to become a lawyer. Defendants dominated me, including overriding my doctor's orders and my desire for healthcare, which I was forced to forego.

441.     I reasonably believed Zarfes to be my friend, and I relied on him and Defendants to act as my agents in academic and health matters.

442.     I was an orphan. I did not have my parents to look out for me or my best interests or care for me. This left me dependent on Defendants.

443.     Defendants repeatedly breached their fiduciary duties to me, which is ongoing to this day. Again, Defendants were required to treat me with loyalty and honesty, including disclosing knowledge of all matters relating to the agency to me. Concealing information that was advantageous to me was a breach. They were prohibited from acquiring interests adverse to mine. Moreover, transactions between us were presumed to be fraudulent.

444.     Defendants acquired interests adverse to mine in being concerned for the Hospital's medical malpractice damages, a position they withheld from me. Violating ABA Standards and their own academic policies, they continued my enrollment when I lacked good standing or the ability to do satisfactory work – including processing and distributing my federal student loans and paying themselves and the Hospital my tuition and fees – and issued invalid grades, credits, transcripts, and a law degree. Although they have an ongoing duty to disclose their fraud and revoke my degree, they have failed to do so.

445.     In violation of my confidence and his duty of loyalty, Zarfes disclosed my medical condition to many people.

446.     When Richardson discovered that Zarfes had violated my confidence, she failed to disclose this to me, to forward his email to me, or to pursue his discipline. Instead, she covered it up, including adopting misleading language that he suggested she use.

447.     Even though Richardson had sufficient information to ask my professor for a paper extension, she made me call her, giving her an opportunity to manipulate me and conceal my damages, which is exactly what she did. This included Richardson lying to me, gaslighting me, diminishing the severity of my illness, and making me agree to return to my internship post-surgery as a condition of my paper extension.

448.     Richardson also forced me to involve Willard, who would be instrumental in concealing my damages. Willard made me stay at my internship when I wanted to leave, communicated with Firm 1 without my prior knowledge or consent to secure an offer for a job I could not do (which Zarfes was also involved in), discouraged me from taking a medical leave of absence, prohibited me from undergoing reconstructive surgery, and (along with Zarfes) making me take the earlier of two starting dates that Firm 1 offered, essentially trying to expedite my graduation.

449.     Further, when Professor A passed away and Levmore discovered that I had failed to submit Paper A on time, Levmore, Richardson, Schill, and Zarfes repeatedly and for years arranged for this paper to be accepted anyway.

450.     Similarly, when I failed to submit Paper C on time and my professor refused to accept it, Zarfes arranged to accept it anyway. In Zarfes's email, he did not simply ask Schill for permission to accept the paper. Instead, he included Richardson and Willard on

the email and openly expressed his concern for damages that the Hospital might otherwise incur. They all concealed Zarfes's statements from me. Further, Schill allowed Zarfes to accept a paper written for a class he never taught, attributed it to an independent research course he couldn't oversee, and issued one academic credit and one writing credit for it.

451.    Subsequently, Schill and Richardson, who had previously denied my request for help to take the New York bar exam, drafted communications to submit to NYBOLE.

452.    In addition, despite my lack of good standing and ability to do satisfactory work, which they were aware of for years, Levmore, Richardson, Schill, Willard, and Zarfes failed to pursue termination of my enrollment.

453.    Despite lack of good standing and failure to meet minimum credit requirements, the University graduated me anyway, with Schill signing my diploma.

454.    When Miles became aware of this matter, he failed to revoke my degree or to tell me what his colleagues, subordinates, or predecessors had done.

455.    The University has failed to provide support services to me, including psychiatric and reproductive healthcare.

456.    Due to the University's breach, I was deprived of federal student loans, tuition and fees, and medical malpractice damages.

457.    All Defendants are jointly and severally liable. For the reasons stated previously, the University and Hospital are alter egos of each other, and adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. For the reasons stated previously, the University and Hospital are liable for the individual Defendants because their actions occurred within the scope of their employment.

## **COUNT IV**

*Common Law Breach of Contract*

459.    I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

460.    My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's breach of contract in mid-2017.

461.    My claims are also timely because the breach of contract is ongoing.

462.    Under Illinois law, to state a claim for breach of contract, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." Reger Development, LLC v. National City Bank, 592 F. 3d 759 (7th Cir. 2010).

463.    "The term 'implied contract' is a familiar one in the law. By reason of the relation of the parties or the existence of an obligation or duty a contract may be implied by law which the party never actually intended to enter into and the obligation of which he did actually intend never to assume. Whether or not it accords with scientific terminology to call an obligation imposed by the existence of a duty an implied contract, yet in the ordinary use of language by courts and writers it has been almost universally so called. 'Implied contracts,' says Blackstone, 'are such as reason and justice dictate, and which, therefore, the law presumes that every man has contracted to perform, and upon this presumption makes him answerable to such persons as suffer by his non-performance.' (3 Com. 158.) In the sixth subdivision of his classification of implied contracts which

arise from natural reason and the just construction of the law, he says: 'The last class of contracts, implied by reason and construction of law, arises upon this supposition: that every one who undertakes any office, employment, trust or duty, contracts with those who employ or entrust him, to perform it with integrity, diligence and skill; and if by his want of either of those qualities any injury accrues to individuals, they have their remedy in damages by a special action on the case.' (Ibid. 163.)" <u>Chudnovski v. Eckels</u>, 232 Ill. 312, 317-8 (Ill. 1908).

464.     One type of implied contract is a contract implied-in-law. "…A contract implied-in-law (quasi-contract) results, regardless of the parties' intentions, from a duty imposed by law and is a contract only in the sense that it is created and governed by equity principles." <u>Id</u>.

465.     Because implied contracts arise in equity, they are broadly construed in favor of the plaintiff. <u>Leo Feist</u>, 138 F.2d at 974 ("It is an elementary maxim of equity jurisprudence that there is no wrong without a remedy."); <u>Fienhold</u>, 275 Ill. at 289 ("…[E]quity does not depend, alone, on precedent. (internal citation omitted) As was said in the case cited, a court of equity will not suffer a right to exist without a remedy."); John Pomeroy, <u>A treatise on equity jurisprudence, as administered in the United States of America: adapted for all the states, and to the union of legal and equitable remedies under the reformed procedure</u>, Volume 1, Edition 2, p. 578 (1892) ("Equity will not suffer a wrong to be without a remedy.").

466.     When I enrolled at the University, we entered into a contract in which the school agreed to provide certain goods and services in exchange for tuition and fees. This included lifetime fiduciary duties of honesty, loyalty, and confidence, which XY enjoyed and the

victims in <u>Mink</u> enjoyed in part when the University confessed to conducting medical experiments on them without their knowledge or consent nearly 30 years after doing so. This also included termination of enrollment for lack of good standing or ability to do satisfactory work. In addition, this included adhering to its own academic policies in issuing grades, credits, transcripts, and a degree.

467.    I substantially performed my end of the bargain by paying the University hundreds of thousands of dollars in tuition and fees.

468.    However, the University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes repeatedly breached our contract, which is ongoing to this day. Again, upon learning of my health crises, Defendants sought to deprive me of medical malpractice damages, federal student loans, and tuition and fees and to unjustly enrich the University and the Hospital with this money; failed to terminate my enrollment when I lacked good standing or the ability to do satisfactory work; falsified my academic records, including issuing fraudulent grades, credits, transcripts, and a law degree; and refused (and continue to refuse) to confess to this fraud, to revoke my fraudulent degree, or to extend support services, including providing psychiatric and reproductive healthcare.

469.    Because of the University's breach of contract, I suffered many damages. I took out additional federal student loans to pay for tuition and fees for an education I was no longer qualified for and was deprived of medical malpractice damages. I also lost my job within months because I was totally unqualified for it.

470.    All Defendants are jointly and severally liable. For the reasons stated previously, the University and Hospital are alter egos of each other, and adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. For the reasons

stated previously, the University and Hospital are liable for the individual Defendants because their actions occurred within the scope of their employment.

## COUNT V

*Common Law Fraudulent Concealment*

471.     I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

472.     My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's fraudulent concealment in mid-2017.

473.     My claims are also timely because the fraudulent concealment is ongoing.

474.     "In Illinois, a plaintiff must allege that a defendant concealed a material fact when he was under a duty to disclose that fact to the plaintiff. (internal citation omitted) The duty to disclose a material fact may arise if the plaintiff and defendant are in a fiduciary or confidential relationship, or if the plaintiff places trust and confidence in the defendant, thereby placing the defendant in a position of influence and superiority over the plaintiff. (internal citation omitted)" Chou, 254 F.3d at 1361.

475.     Under Illinois law, plaintiffs in fraud cases are entitled to actual and punitive damages, and there is no cap on punitive damages. K2 Development, 2013 Ill. App. 103672.

476.     As discussed previously in this document, the University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes were my fiduciaries at law and based on the circumstances.

477.     Based on our fiduciary relationship, the University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes had and continue to have a duty to disclose that they or others were legally adverse to me and represented the interests of the University and Hospital

regarding my medical malpractice damages. All of them repeatedly failed to do this. For example, in June 2008, Richardson communicated with me by email and phone claiming to want to "assist" me "whatever way possible" me and omitted her adverse legal position. In December 2010, Zarfes emailed Schill, Richardson, and Willard expressing concern for the Hospital's medical malpractice damages. All four of them failed to disclose this email or Zarfes's concern to me. Similarly, University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes continue to conceal this fraud from me.

478.	All Defendants are jointly and severally liable. For the reasons stated previously, the University and Hospital are alter egos of each other, and adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. For the reasons stated previously, the University and Hospital are liable for the individual Defendants because their actions occurred within the scope of their employment.

## COUNT VI

*Common Law Unjust Enrichment*

479.     I hereby incorporate each and every allegation of the Complaint as if herein alleged in full.

480.     My claims are timely under 735 ILCS 5/13-215, an Illinois State equitable tolling statute, under which there is a five-year SOL that tolls upon discovery of wrongdoing by a fiduciary. I am within the SOL because the University and its employees are my fiduciaries, and I discovered the University's unjust enrichment in mid-2017.

481.     "To state a cause of action based on a theory of unjust enrichment under Illinois law, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience. (internal citation omitted)" Chou, 254 F.3d at 1363.

482.     The University, Levmore, Miles, Richardson, Schill, Willard, and Zarfes unjustly enriched themselves, their employer, or their employer's alter ego and subsidiary with my medical malpractice damages, federal student loans, and tuition and fees by fraudulently continuing my enrollment when I lacked good standing or the ability to do satisfactory work; issuing grades, credits, transcripts, and a law degree in violation of its own academic policies; and refusing to confess to its fraud or revoke my degree.

483.     It is a maxim of equity that no one may profit from his own wrongdoing. Reynolds v. United States, 98 US 145, 159 (1879) ("The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong."); Bradley v. Fox, 7 Ill. 2d 106, 112 (Ill. 1955) (referring to the "fundamental common-law maxim originating in English

law that no man shall profit by his own wrong"); <u>Riggs v. Palmer</u>, 115 NY 506, 511-2 (NY 1889) ("No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes."). To allow the University to retrain the fruits of its fraud would be a violation of equity.

484.     Defendants are jointly and severally liable. For the reasons stated previously, the University and Hospital are alter egos of each other, and adhering to the fiction of separate corporate existence would sanction a fraud or promote injustice. For the reasons stated previously, the University and Hospital are liable for the individual Defendants because their actions occurred within the scope of their employment.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendants in Plaintiff's favor for the following:

A.      An order directing the University to revoke my degree;

B.      An order for actual, statutory, punitive, and any other damages I am entitled to to be determined at trial of not less than $1 billion;

C.      An award of pre-judgment and post-judgment interest accruing at the applicable statutory rate;

D.      An order directing the University to provide for my attorney's fees and any other reasonable costs for a lawsuit of not less than $2 million per year for as long as this matter continues, any unused portion of which shall be returned to the University upon conclusion of this legal matter;

E.      An order directing the University to provide funds of not less than $150,000 for my medical care, including psychiatric care, fertility treatment (such as freezing my eggs), reconstructive surgery, and where appropriate compensation for taking time off from work or from looking for work; and

F.      Orders or awards directing other such relief as I may be entitled to but am unaware of and the Court may deem appropriate.